UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

Hearing Date: March 14, 2011
Time: 2:00 p.m.

-------------------------------------------------

In re:

KOREA LINE CORPORATION,

Debtor in a Foreign Proceeding.

-------------------------------------------------

Chapter 15

Case No. 11-10789(REG)

**OLDENDORFF'S OBJECTION TO ENTRY OF PRELIMINARY INJUNCTION IN RESPECT OF ITS BUNKERS ON BOARD THE M/V K DAPHNE**

OLDENDORFF Carriers GMBH & Co. KG ("OLDENDORFF") objects to Korea Line Corp. ("KLC") request for a preliminary injunction preventing OLDENDORFF obtaining possession of the M/V K DAPHNE.

## FACTS

The facts are set out in the previously filed Declaration of David Boxall filed on March 3, 2011. (Docket #9).

On January 25, 2011, KLC filed a "petition for rehabilitation" in Korea, according to the Declaration dated Feb. 23, 2011 of Jin Bang Lee in support of its Chapter 15 application.

On February 23, 2011, KLC terminated its time-charter with Grand China. Consequently, the sub-time-charter between Grand China and OLDENDORFF terminated simultaneously.

KLC then time-chartered the vessel to a company named "Polaris."

When the KLC/Grand China and Grand China/OLDENDORFF charter parties were terminated on February 23, 2011, there remained on board ("ROB") an estimated 2,678.2 m.t. of Intermediate Fuel Oil ("IFO" or "IFO 380"); 332.78 m.t. low sulphur IFO; 52.1 m.t.. Marine Gas

1

Oil or Marine Diesel Oil ("MGO" or "MDO"); and 72.2 m.t. low sulphur MGO. OLDENDORFF has not been repaid for any part of said bunkers.

The ROB was the unconsumed balance of the following bunkers purchased and provided by OLDENDORFF:

| | | |
|---|---|---|
| i. | 2,687.692 m.t. on delivery: | $1,397,599.84 |
| ii. | 55,030 m.t. mdo on delivery: | $ 41,272.50 |
| iii. | 69.772 m.t. low sulphur IFO on delivery: | $ 36,281.44 |
| iv. | 28.809 m.t. low sulphur MGO on delivery: | $ 21,606.75 |
| v. | 100,000 m.t. low sulphur IFO at Tenerife On 2/10/11: | $ 58,300.00 |
| vi. | 1,549.825 m.t. IFO at Rotterdam on 2/18: | $831,481.11 |
| vii. | 350.545 m.t. low sulphur IFO at Rdm on 2/18: | $191,748.12 |
| viii. | 64.779 m.t. low sulphur MGO at Rdm on 2/18: | $ 55,191.71 |

Copies of the first hire account and the bunkering invoices and delivery receipts are Ex. C to the Boxall Declaration.

OLDENDORFF requests that KLC be directed to pay OLDENDORFF **$1,771,071** or else by that date provide OLDENDORFF a bond in that amount plus interest from an approved surety, payable pursuant to the further order of this Court. It is requested that this Court's order specify that the eventual order for payment may be based on its holding that the bunkers belong to OLDENDORFF, or that the value of the bunkers is adjudged by the Korean Court to be an administrative expense, or on such other grounds as this Court may deem appropriate. Failing the provision of payment or a bond before March 5, it is requested that OLDENDORFF be permitted to prosecute a Rule D action against the bunkers.

The amount of $1,771,071 above is based on the purchase prices evidenced in Ex. C hereto, as follows:

| | | |
|---|---|---|
| i. | 1,549.825 m.t. IFO @ $536.60 = | $831,481 |
| ii. | 1,227.375 m.t. IFO @ $520 = | 638.235 |
| iii. | 350.545 low sulphur IFO @ $547 = | 191,748 |

2

| | | |
|---|---|---|
| iv. | 16.755 low sulphur IFO @ $583 = | 9,768 |
| v. | 52.1 MGO @ $750 = | 39,075 |
| vi. | 64.779 low sulphur MGO @ $852 = | 55,192 |
| vii. | 7.43 low sulphur MGO @ $750 = | 5,572 |

**TOTAL:** <u>**$1,771,071**</u>

It is estimated, based on the ship's consumption, that upon arrival at Hampton Roads, the following bunkers will remain on board. The value of such bunkers, based on an offer OLDENDORFF has received to purchase the bunkers (Ex. D hereto), is also indicated.

| | | |
|---|---|---|
| i. | 2000 m.t. IFO @ $ 627 = | $1.254.000 |
| ii. | 367 m.t. low sulphur IFO @ $ 627 = | $230.109 |
| iii. | 52 m.t. MGO @ $960 = | $49.920 |
| iv. | 72 m.t.. low sulphur MGO @ $960 = | $69.120 |

**TOTAL:** $1.603.149

## ARGUMENT

### POINT I

### KLC DOES NOT OWN THE VESSEL

It now appears that the Vessel is not owned by KLC but by LTSF KL 2 Inc., which is not a debtor. Harwood Declaration, Ex. A.

### POINT II

### KLC DOES NOT OWN THE BUNKERS

KLC's new charterer Polaris likely paid KLC for the bunkers, KLC has no claim on them. Rather, the competing interests in the bunkers are OLDENDORFF and Polaris. Therefore, KLC has no claim to the bunkers against which to set off its unrelated charter claims against OLDENDORFF.

At the very least, OLDENDORFF should be permitted to obtain and sell the bunkers, with the proceeds to be deposited in Court to secure both parties' claims, or until

3

OLDENDORFF, at its option, provides security for KLC's charter claims, and the Court sorts out the status of the interests in the bunkers.

As shown by Mr. Boxall, under time charters generally, and under OLDENDORFF's sub-time-charter specifically, it is the time-charterer's duty to provide fuel oil ("bunkers") to the vessel, which also entails paying the ship owner or "disponent owner" (*i.e.* the time-chartered operator, such as Grand China) for the bunkers on board upon delivery of the vessel under the time charter. The time charterer or sub-time-charterer has title to the bunkers until the end of the charter party or sub-charter party and redelivery of the vessel, when the ship owner or disponent owner is required to pay the time charterer for the bunkers remaining on board. (See third page of Ex. B: "First hire to be paid within 3 working days after vessel's delivery together with value of bunkers on delivery . . . chrtrs [charterers] have the right to deduct value of bunkers on redel[ivery] against last sufficient hire payments.")

As stated in the American law section of T. Coghlin, A. Baker, J. Kenny, J. Kimball, Time Charters (6th Ed. 2008), at ¶ 12.42, p. 254:

> Fuel provided by the charterer becomes its property. This concept can be important in situations where the charterer's creditors may seek to attach the bunkers on board or the charterer goes into bankruptcy and its assets become property of the bankruptcy estate. * * *

Similarly, the English law section of Time Charters states at ¶ 12.3, p. 248:

> Provision is made in Clause 3 of the New York Produce form and Clause 5 of the Baltime form for the purchase by the charterers of fuel on board on delivery and by the owners of fuel on board on redelivery . . . Fuel so purchased by the charterers becomes their property, together with fuel provided by them during the charter service . . . ."

The English authors went on to say at ¶ 12.12, p. 249:

> In *The Saint Anna* [1980] Lloyd's Rep. 180 it was held by Sheen, J., that charterers under a Shelltime 3 form of charter retained the property in fuel which had been supplied and paid for by them and which was on board the ship. Referring to the provision in Clause 6 of that charter that the charterers "shall provide and pay for all fuel (except galley fuel)" he said: "It seems to me that if the charters purchase fuel, that fuel is their property unless the parties clearly and unequivocally agree that the property shall vest in the owners." The decision in *The Saint Anna* was approved by the House of Lords in *The San Terza* [1984] 1 Lloyd's Rep. 119, who held that the position was the same under the New York Produce form. There is a similar provision in Clause 4 of the Baltime form.
>
> * * *

Pursuant to the aforesaid practice, Polaris presumably paid KLC for the bunkers on board as of the commencement of the KLC/Polaris time charter, at a price agreed in that charter. However, OLDENDORFF was entitled to the return of those bunkers, in which it still held the property. KLC had no title in the bunkers to convey to Polaris and certainly has none now.

Following the hearing on Oldendorff's order to show cause seeking relief from the TRO, which the court conditionally denied, the court ordered "prompt" disclosure of documents relating to the ownership of the bunkers. Oldendorff has made repeated, specific demands for such documentation. Harwood Dec. Ex. B. KLC has produced only a pro forma, unexecuted, charter in this respect. Harwood Dec. Ex. C. KLC has not, as a matter of law, established how it could obtain title to the bunkers or under what arrangement third parties (Polaris) are using them.

## CONCLUSION

The injunction order should not be entered against OLDENDORFF, or, alternatively, an order should be entered directing that KLC either pay OLDENDORFF for the bunkers or provide it with a surety bond in the amount of $1,771,071 plus interest, payable against this Court's further order, which order may be based on a holding by this Court that OLDENDORFF would have been entitled to an order under Supplemental Rule D granting it possession of the bunkers,

667664.00624/7001548v.1

or an adjudication by the Korean Court that the value of the bunkers is recoverable by OLDENDORFF as an administrative expense, or any other grounds this Court deems appropriate.

Dated: New York, N. Y.
       March 10, 2011

                                                 BLANK ROME, LLP

                                      By: *Jeremy J. O. Harwood*
                                            Jeremy J. O. Harwood
                                            Richard V. Singleton
                                            Jack A. Greenbaum
                                            405 Lexington Ave.
                                            New York, NY 10174-0208
                                            Tel.: (212) 885-5000
                                            Fax: (212) 885-5001
                                            jharwood@blankrome.com