UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

Hearing Date: March 14, 2011
Time: 2:00 p.m.

------------------------------------------------------

In re:

KOREA LINE CORPORATION,

     Debtor in a Foreign Proceeding.

------------------------------------------------------

Chapter 15

Case No. 11-10789(REG)

**DECLARATION IN SUPPORT
OF ORDER TO SHOW CAUSE**

JEREMY J. O. HARWOOD deposes and says:

1.     I am a member of the firm of Blank Rome LLP, attorneys for Oldendorff Carriers GMBH & Co. KG. (hereafter "OLDENDORFF.") This Declaration is submitted in opposition to issuance of an injunction order.

2.     I attach as Exhibit A a true copy of the "Ship Overview," available at http://www-sea-web.com, showing the registered owner of the M/V "K DAPHNE" is not KLC.

3.     I attach as Exhibit B hereto true copies of our requests to KLC's counsel for ownership documents, as ordered to be produced by the Court, in respect of the bunkers.

4.     I attach as Exhibit C a true copy of the only document provided by KLC in this respect.

5.     KLC will have used this Court's section 1519 relief not to protect its own assets but to permit a third party's consumption of Oldendorff's assets based on KLC's conversion and purported sale of Oldendorff's bunkers. In essence, KLC will have "kited" Oldendorff's bunkers in purported exchange for either eventual compensation in the Korean rehabilitation proceedings in some uncertain future date and amount or based on an alleged set off by which it has improperly "secured" its purported counterclaims by "selling" Oldendorff's property.

I declare under penalty of perjury that the foregoing is true and correct.

<div align="center">1</div>

Executed at  New York, NY on March 10, 2011

_____/s/ Jeremy J.O. Harwood_____
Jeremy J. O. Harwood

667664.00624/7001569v.1

# EXHIBIT A

# SHIP OVERVIEW

| | | | |
|---|---|---|---|
| Ship Name | K. DAPHNE | Shiptype | **Bulk Carrier** |
| Year of Build | **2009** | LR/IMO Ship No. | 9452397 |
| Gross Tonnage | **95,054** | Deadweight | **180,786** |
| MMSI No. | 351629000 | Call Sign | **3EZF9** |
| Status | **In Service/Commission** | Flag | **Panama** |

# REGISTRATION, P&I, AND COMMUNICATIONS

| | | | |
|---|---|---|---|
| Port of Registry | **Panama** | Flag | **Panama** |
| Official Number | 4144010 | Sat Com ID | 435162912 |
| Sat Com Ans Back | | Fishing Number | |
| P&I Club | **Britannia Steam Ship Ins Assoc** | | |

# OWNERSHIP?

| | | | | |
|---|---|---|---|---|
| Group Owner | **Korea Development Bank** | Location | **Korea, South** | |
| Shipmanager | **Korea Line Corp** | Location | **Korea, South** | |
| Operator | **Korea Line Corp** | Location | **Korea, South** | |
| DOC Company | **KLC SM Co Ltd** | Location | **Korea, South** | IMO Company No (DOC) | 1755263 |
| Registered Owner | **LTSF KL 2 Inc** | Location | **Panama** | IMO Registered Owner No | 5511528 |
| Technical Manager | **KLC SM Co Ltd** | Location | **Korea, South** | |

# COMMERCIAL HISTORY

| Date | Name | Flag | Group Owner | Operator | Manager | Registered Owner | DOC | Price |
|---|---|---|---|---|---|---|---|---|
| 2010-04 | | | | | | | KLC SM Co Ltd | |
| 2010-03 | | | Korea Development Bank | | | | | |
| 2009-12 | K. DAPHNE | Panama | | Korea Line Corp | Korea Line Corp | LTSF KL 2 Inc | Unknown | |
| Originally K. DAPHNE | | | | | | | | |

# EVENT TIMELINE

| Date | Significant Events |
|---|---|
| 2010-05 | PSC Inspected |
| 2010-04 | SMC Certificate issued by Korean Register of S Expires 20150428, Technical Manager KLC SM Co Ltd |
| 2010-03 | Group Owner Korea Development Bank |
| 2009-12 | Name changed to K. DAPHNE, Classed KR, Flagged by Panama, Status changed to In Service/Commission, Operator Korea Line Corp, Technical Manager Korea Line Corp, Owner LTSF KL 2 Inc, Ship Manager Korea Line Corp |

## AIS POSITION

## AIS LINK

To view information available on the AIS website for this vessel, click on the button below.

[ AISLive ]

| 2007-05 | Status changed to On Order/Not Commenced |
| 2008-03 | Contemplated KR |
| 2009-09 | Status changed to Keel Laid |
| 2009-11 | Status changed to Launched |

# Southern North Sea



9/3/2011 17:22:48 UTC  Visible Tracks: 1

K.DAPHNE

| | | | | |
|---|---|---|---|---|
| MMSI | 351629000 | Last seen at | 1/3/2011 21:26:10 UTC |
| Name | K.DAPHNE | Latitude | N 48°43.070' |
| Callsign | 3EZF9 | Longitude | W 7°20.958' |
| IMO number | 9452397 | Heading | 250° |
| Length | 292 m | Speed | 14.1 knots |
| Beam | 45 m | Destination | BALTIMORE _USA_ |
| Draught | 11.4 m | ETA | 12/3/2011 12:00:00 UTC |
| Vessel Type | Cargo | Status | Under way using engine |

0 NM          200.0          400.0

**MOVEMENTS**

Currently trading in UK - Continent - Baltic

Reported 2011-02-20 sailed from Maasvlakte, Netherlands bound for Baltimore (USA)

At most, the last 50 movements are returned. Click here to return all movements for the ship or on a port to view ships in that port at that time.

 Click here to see the latest movements displayed in Google Earth

| Port of Call | Country | Arrival Date | Sailing Date | Hours in Port |
|---|---|---|---|---|
| Transit Dover Straits SW | | 2011-02-28 | 2011-02-28 | |
| Maasvlakte | Netherlands | 2011-02-16 | 2011-02-20 | 84 |
| Transit Dover Straits NE | | 2011-02-16 | 2011-02-16 | |
| Santa Cruz de Tenerife Anchorage | Canary Islands | 2011-02-08 | 2011-02-10 | 42 |
| Richards Bay | South Africa | 2011-01-21 | 2011-01-23 | 53 |
| Richards Bay | South Africa | 2011-01-14 | 2011-01-15 | 24 |
| Richards Bay | South Africa | 2011-01-14 | 2011-01-14 | <2 |
| Richards Bay | South Africa | 2011-01-14 | 2011-01-14 | <2 |
| Richards Bay Anchorage | South Africa | 2011-01-14 | 2011-01-14 | <2 |
| Transit Malacca Strait Singapore W | | 2010-12-29 | 2010-12-29 | |
| Yangtze River Mouth No 2 Anchorage | China | 2010-12-22 | 2010-12-22 | <2 |
| Shanghai | China | 2010-12-21 | 2010-12-22 | 26 |
| Shanghai | China | 2010-12-20 | 2010-12-21 | 14 |
| Transit Malacca Strait Singapore E | | 2010-12-06 | 2010-12-06 | |
| Singapore Eastern Special Purposes Anchorage | Singapore | 2010-12-06 | 2010-12-06 | 4 |
| Singapore Eastern Special Purposes Anchorage | Singapore | 2010-12-05 | 2010-12-06 | 6 |
| Praia Mole | Brazil | 2010-10-21 | 2010-10-29 | 184 |
| Tubarao Anchorage-3 | Brazil | 2010-10-10 | 2010-10-21 | 274 |
| Vancouver Harbour Anchorage | Canada | 2010-09-11 | 2010-09-11 | <2 |
| North Vancouver | Canada | 2010-09-07 | 2010-09-11 | 86 |
| Vancouver Anchorage No 1-12 | Canada | 2010-08-29 | 2010-09-07 | 209 |
| Ridley Island | Canada | 2010-08-26 | 2010-08-27 | 42 |
| Rizhao | China | 2010-08-10 | 2010-08-13 | 75 |
| Port Hedland Anchorage | Australia | 2010-07-29 | 2010-07-29 | <2 |
| Port Hedland | Australia | 2010-07-27 | 2010-07-29 | 47 |
| Port Hedland Anchorage | Australia | 2010-07-25 | 2010-07-27 | 36 |
| Transit Malacca Strait Singapore E | | 2010-06-28 | 2010-06-28 | |
| Singapore Eastern Special Purposes Anchorage | Singapore | 2010-06-28 | 2010-06-28 | 12 |
| Itaqui | Brazil | 2010-05-27 | 2010-05-29 | 38 |
| Transit Dover Straits SW | | 2010-05-03 | 2010-05-03 | |
| Ridens Anchorage | France | 2010-05-03 | 2010-05-03 | <2 |
| Dunkirk | France | 2010-04-28 | 2010-05-03 | 138 |
| Ridens Anchorage | France | 2010-04-27 | 2010-04-27 | 3 |

| | | | | |
|---|---|---|---|---|
| Transit Dover Straits NE | | 2010-04-27 | 2010-04-27 | 6 |
| Santa Cruz de Tenerife Anchorage | Canary Islands | 2010-04-22 | 2010-04-23 | 6 |
| Praia Mole | Brazil | 2010-04-11 | 2010-04-12 | 18 |
| Singapore Eastern Bunkering Anchorage | Singapore | 2010-02-23 | 2010-02-24 | 12 |
| Transit Malacca Strait Singapore W | | 2010-02-23 | 2010-02-23 | |
| Kitakyushu | Japan | 2010-02-16 | 2010-02-16 | <2 |
| Hibikinada | Japan | 2010-02-16 | 2010-02-16 | <2 |
| Kitakyushu | Japan | 2010-02-16 | 2010-02-16 | <2 |
| Hibikinada | Japan | 2010-02-16 | 2010-02-16 | 2 |
| Kitakyushu | Japan | 2010-02-16 | 2010-02-16 | 3 |
| Hibikinada | Japan | 2010-02-16 | 2010-02-16 | 5 |
| Kitakyushu | Japan | 2010-02-16 | 2010-02-16 | <2 |
| Hibikinada | Japan | 2010-02-16 | 2010-02-16 | 6 |
| Kitakyushu | Japan | 2010-02-16 | 2010-02-16 | 5 |
| Hibikinada | Japan | 2010-02-15 | 2010-02-15 | <2 |
| Kitakyushu | Japan | 2010-02-15 | 2010-02-15 | <2 |
| Hibikinada | Japan | 2010-02-15 | 2010-02-15 | 2 |

## TRADING AREAS LAST 12 MONTHS

Australasia
East and South Africa
East Coast South America
Far East
Gulf – Red Sea – India
South East Asia
UK – Continent – Baltic
US East Coast
US West Coast
West Africa
West Coast South America

© 2011 IHS Global Limited. IHS Global Limited assumes no responsibility and shall not be liable to any person for any loss, damage or expense caused by reliance on the information or advice in this document or howsoever provided, unless that person has a contract with IHS Global Limited and in that case any responsibility or liability is exclusively on the terms and conditions set out in that contract.

# COMPANY OVERVIEW

| Short Name | LTSF KL 2 Inc | Company No. | 5511528 |
| Full Company Name | LTSF KL 2 Inc | | |
| Nationality of Registration | Panama | Nationality of Control | Korea, South |
| Status | Existing | Founded | 2009 |

**This company is a subsidiary of Group: Korea Development Bank**

© 2011 IHS Global Limited. IHS Global Limited assumes no responsibility and shall not be liable to any person for any loss, damage or expense caused by reliance on the information or advice in this document or howsoever provided, unless that person has a contract with IHS Global Limited and in that case any responsibility or liability is exclusively on the terms and conditions set out in that contract.



**EXHIBIT B**

| | |
|---|---|
| **From:** | Greenbaum, Jack A. |
| **Sent:** | Friday, March 04, 2011 5:29 PM |
| **To:** | James.Power@hklaw.com |
| **Cc:** | Singleton II, Richard V.; Harwood, Jeremy J.O. |
| **Subject:** | KLC/OLDENDORFF |

**Importance:** High

James,

For the sake of good order, we recap here the documents Oldendorff requests KLC to produce <u>promptly</u> as directed by Judge Gerber.

1. The KLC/Polaris charter party; the fixture recap and/or confirmation; all communications regarding the negotiation of the charter terms; the on-hire and/or delivery certificate; the on-hire bunker survey; all other bunker surveys performed during the Polaris charter party; the first hire account or invoice rendered by KLC to Polaris; and any other form of invoices for bunkers issued by KLC to Polaris.
2. The vessel's ETA[s] at US ports and the documents reflecting the "laycan" to which you referred at the hearing.
3. The engine room and bunker logs from the time the vessel was delivered into Oldendorff's service until the date the ship arrives in the U.S.
4. All bunker delivery receipts from the time the vessel was delivered into Oldendorff's service until the date the ship arrives in the U.S.
5. KLC's withdrawal notice to Grand China.
6. Any bunker survey performed upon the withdrawal of the Vessel from Grand China.

As you already have the Polaris charter party, the documents regarding arrival and the withdrawal notice, we request these be provided no later than Monday in compliance with the judge's directive for prompt production. There is no rule of law or custom that permits you to wait until Oldendorff produces documents you have not even requested yet, the judge made no such stipulation this morning, and the judge's Case Management Order provides for <u>expedited</u> discovery. See paragraph 24.

Regards,

Jack

**Jack A. Greenbaum | Blank Rome LLP**
The Chrysler Building, 405 Lexington Avenue | New York, NY 10174-0208
Phone: 212.885.5284 | Fax: 917.332.3834 | Email: JGreenbaum@BlankRome.com

| | |
|---|---|
| **From:** | Greenbaum, Jack A. |
| **Sent:** | Tuesday, March 08, 2011 12:14 PM |
| **To:** | James.Power@hklaw.com |
| **Cc:** | Singleton II, Richard V.; Harwood, Jeremy J.O. |
| **Subject:** | RE: KLC/OLDENDORFF |

James,

Thank you for the quoted Polaris charter lay/can information, bunker quantities at the time of withdrawal, and the Grand China withdrawal notice you provided yesterday. At the hearing last week, I thought you said the ship would be discharging in the U.S. Under what contract is the vessel currently performing, if the Polaris contract is not to begin until March 21? Where and when is the ship to discharge?

I am disappointed you did not see fit to provide us with the Polaris charter party, which is already in your possession. Please do so today and provide us with the other documents we requested as soon as possible.

Jack

**Jack A. Greenbaum | Blank Rome LLP**
The Chrysler Building, 405 Lexington Avenue | New York, NY 10174-0208
Phone: 212.885.5284 | Fax: 917.332.3834 | Email: JGreenbaum@BlankRome.com

**From:** Greenbaum, Jack A.
**Sent:** Friday, March 04, 2011 5:29 PM
**To:** 'James.Power@hklaw.com'
**Cc:** Singleton II, Richard V.; Harwood, Jeremy J.O.
**Subject:** KLC/OLDENDORFF
**Importance:** High

James,

For the sake of good order, we recap here the documents Oldendorff requests KLC to produce promptly as directed by Judge Gerber.

1. The KLC/Polaris charter party; the fixture recap and/or confirmation; all communications regarding the negotiation of the charter terms; the on-hire and/or delivery certificate; the on-hire bunker survey; all other bunker surveys performed during the Polaris charter party; the first hire account or invoice rendered by KLC to Polaris; and any other form of invoices for bunkers issued by KLC to Polaris.
2. The vessel's ETA[s] at US ports and the documents reflecting the "laycan" to which you referred at the hearing.
3. The engine room and bunker logs from the time the vessel was delivered into Oldendorff's service until the date the ship arrives in the U.S.
4. All bunker delivery receipts from the time the vessel was delivered into Oldendorff's service until the date the ship arrives in the U.S.
5. KLC's withdrawal notice to Grand China.
6. Any bunker survey performed upon the withdrawal of the Vessel from Grand China.

As you already have the Polaris charter party, the documents regarding arrival and the withdrawal notice, we request these be provided no later than Monday in compliance with the judge's directive for prompt production. There is no rule of law or custom that permits you to wait until Oldendorff produces documents you have not even requested yet, the judge made no such stipulation this morning, and the judge's Case Management Order provides for expedited discovery. See paragraph 24.

Regards,

Jack

**Jack A. Greenbaum | Blank Rome LLP**
The Chrysler Building, 405 Lexington Avenue | New York, NY 10174-0208
Phone: 212.885.5284 | Fax: 917.332.3834 | Email: JGreenbaum@BlankRome.com

| | |
|---|---|
| **From:** | Greenbaum, Jack A. |
| **Sent:** | Tuesday, March 08, 2011 12:14 PM |
| **To:** | James.Power@hklaw.com |
| **Cc:** | Singleton II, Richard V.; Harwood, Jeremy J.O. |
| **Subject:** | RE: KLC/OLDENDORFF |

James,

Thank you for the quoted Polaris charter lay/can information, bunker quantities at the time of withdrawal, and the Grand China withdrawal notice you provided yesterday. At the hearing last week, I thought you said the ship would be discharging in the U.S. Under what contract is the vessel currently performing, if the Polaris contract is not to begin until March 21? Where and when is the ship to discharge?

I am disappointed you did not see fit to provide us with the Polaris charter party, which is already in your possession. Please do so today and provide us with the other documents we requested as soon as possible.

Jack

**Jack A. Greenbaum | Blank Rome LLP**
The Chrysler Building, 405 Lexington Avenue | New York, NY 10174-0208
Phone: 212.885.5284 | Fax: 917.332.3834 | Email: JGreenbaum@BlankRome.com

**From:** Greenbaum, Jack A.
**Sent:** Friday, March 04, 2011 5:29 PM
**To:** 'James.Power@hklaw.com'
**Cc:** Singleton II, Richard V.; Harwood, Jeremy J.O.
**Subject:** KLC/OLDENDORFF
**Importance:** High

James,

For the sake of good order, we recap here the documents Oldendorff requests KLC to produce promptly as directed by Judge Gerber.

1. The KLC/Polaris charter party; the fixture recap and/or confirmation; all communications regarding the negotiation of the charter terms; the on-hire and/or delivery certificate; the on-hire bunker survey; all other bunker surveys performed during the Polaris charter party; the first hire account or invoice rendered by KLC to Polaris; and any other form of invoices for bunkers issued by KLC to Polaris.
2. The vessel's ETA[s] at US ports and the documents reflecting the "laycan" to which you referred at the hearing.
3. The engine room and bunker logs from the time the vessel was delivered into Oldendorff's service until the date the ship arrives in the U.S.
4. All bunker delivery receipts from the time the vessel was delivered into Oldendorff's service until the date the ship arrives in the U.S.
5. KLC's withdrawal notice to Grand China.
6. Any bunker survey performed upon the withdrawal of the Vessel from Grand China.

As you already have the Polaris charter party, the documents regarding arrival and the withdrawal notice, we request these be provided no later than Monday in compliance with the judge's directive for prompt production. There is no rule of law or custom that permits you to wait until Oldendorff produces documents you have not even requested yet, the judge made no such stipulation this morning, and the judge's Case Management Order provides for expedited discovery. See paragraph 24.

Regards,

Jack

**Jack A. Greenbaum | Blank Rome LLP**
The Chrysler Building, 405 Lexington Avenue | New York, NY 10174-0208
Phone: 212.885.5284 | Fax: 917.332.3834 | Email: <u>JGreenbaum@BlankRome.com</u>

**Harwood, Jeremy J.O.**

| | |
|---|---|
| **From:** | Greenbaum, Jack A. |
| **Sent:** | Monday, March 07, 2011 6:56 AM |
| **To:** | Singleton II, Richard V.; Harwood, Jeremy J.O. |
| **Subject:** | Fw: KLC/OLDENDORFF |
| **Attachments:** | K.DAPHNE - termination.pdf |

---

**From:** James.Power@hklaw.com [mailto:James.Power@hklaw.com]
**Sent:** Monday, March 07, 2011 12:17 AM
**To:** Greenbaum, Jack A.
**Subject:** RE: KLC/OLDENDORFF

Please see attached.

---

**From:** Greenbaum, Jack A. [mailto:jgreenbaum@BlankRome.com]
**Sent:** Friday, March 04, 2011 5:29 PM
**To:** Power, James H (NYC - X73494)
**Cc:** Singleton II, Richard V.; Harwood, Jeremy J.O.
**Subject:** KLC/OLDENDORFF
**Importance:** High

James,

For the sake of good order, we recap here the documents Oldendorff requests KLC to produce promptly as directed by Judge Gerber.

1.  The KLC/Polaris charter party; the fixture recap and/or confirmation; all communications regarding the negotiation of the charter terms; the on-hire and/or delivery certificate; the on-hire bunker survey; all other bunker surveys performed during the Polaris charter party; the first hire account or invoice rendered by KLC to Polaris; and any other form of invoices for bunkers issued by KLC to Polaris.
2.  The vessel's ETA[s] at US ports and the documents reflecting the "laycan" to which you referred at the hearing.
3.  The engine room and bunker logs from the time the vessel was delivered into Oldendorff's service until the date the ship arrives in the U.S.
4.  All bunker delivery receipts from the time the vessel was delivered into Oldendorff's service until the date the ship arrives in the U.S.
5.  KLC's withdrawal notice to Grand China.
6.  Any bunker survey performed upon the withdrawal of the Vessel from Grand China.

As you already have the Polaris charter party, the documents regarding arrival and the withdrawal notice, we request these be provided no later than Monday in compliance with the judge's directive for prompt production. There is no rule of law or custom that permits you to wait until Oldendorff produces documents you have not even requested yet, the judge made no such stipulation this morning, and the judge's Case Management Order provides for expedited discovery. See paragraph 24.

Regards,

Jack

**Jack A. Greenbaum | Blank Rome LLP**
The Chrysler Building, 405 Lexington Avenue | New York, NY 10174-0208
Phone: 212.885.5284 | Fax: 917.332.3834 | Email: JGreenbaum@BlankRome.com

*********************************************************************************
*******************

This message and any attachments may contain confidential or privileged information and are only for the use of the intended recipient of this message. If you are not the intended recipient, please notify the sender by return email, and delete or destroy this and all copies of this message and all attachments. Any unauthorized disclosure, use, distribution, or reproduction of this message or any attachments is prohibited and may be unlawful.

*********************************************************************************
*******************

Any Federal tax advice contained herein is not intended or written to be used, and cannot be used by you or any other person, for the purpose of avoiding any penalties that may be imposed by the Internal Revenue Code. This disclosure is made in accordance with the rules of Treasury Department Circular 230 governing standards of practice before the Internal Revenue Service. Any written statement contained herein relating to any Federal tax transaction or matter may not be used by any person without the express prior written permission in each instance of a partner of this firm to support the promotion or marketing of or to recommend any Federal tax transaction(s) or matter(s) addressed herein.

*********************************************************************************
*******************

To ensure compliance with Treasury Regulations (31 CFR Part 10, Sec. 10.35), we inform you that any tax advice contained in this correspondence was not intended or written by us to be used, and cannot be used by you or anyone else, for the purpose of avoiding penalties imposed by the Internal Revenue Code.

NOTE: This e-mail is from a law firm, Holland & Knight LLP ("H&K"), and is intended solely for the use of the individual(s) to whom it is addressed. If you believe you received this e-mail in error, please notify the sender immediately, delete the e-mail from your computer and do not copy or disclose it to anyone else. If you are not an existing client of H&K, do not construe anything in this e-mail to make you a client unless it contains a specific statement to that effect and do not disclose anything to H&K in reply that you expect it to hold in confidence. If you properly received this e-mail as a client, co-counsel or retained expert of H&K, you should maintain its contents in confidence in order to preserve the attorney-client or work product privilege that may be available to protect confidentiality.

| | |
|---|---|
| **From:** | Greenbaum, Jack A. |
| **Sent:** | Wednesday, March 09, 2011 4:47 PM |
| **To:** | James.Power@hklaw.com |
| **Cc:** | Singleton II, Richard V.; Harwood, Jeremy J.O. |
| **Subject:** | RE: KLC/OLDENDORFF |

Thanks.  When can we expect the fixture confirmation/recap and negotiating communications?

**Jack A. Greenbaum | Blank Rome LLP**
The Chrysler Building, 405 Lexington Avenue | New York, NY 10174-0208
Phone: 212.885.5284 | Fax: 917.332.3834 | Email: JGreenbaum@BlankRome.com

**From:** James.Power@hklaw.com [mailto:James.Power@hklaw.com]
**Sent:** Wednesday, March 09, 2011 4:38 PM
**To:** Greenbaum, Jack A.
**Subject:** RE: KLC/OLDENDORFF

Jack:

Please see attached form Polaris charter which I understand is in use. I will try and get you and executed copy if available.   I continue to try and seek answers to your questions.

James

**James Power | Holland & Knight**
Partner
31 West 52nd Street | New York NY 10019
Phone 212.513.3494 | Fax 212.385.9010
james.power@hklaw.com | www.hklaw.com
_____
Add to address book | View professional biography

> **From:** Greenbaum, Jack A. [mailto:jgreenbaum@BlankRome.com]
> **Sent:** Tuesday, March 08, 2011 12:14 PM
> **To:** Power, James H (NYC - X73494)
> **Cc:** Singleton II, Richard V.; Harwood, Jeremy J.O.
> **Subject:** RE: KLC/OLDENDORFF
>
> James,
>
> Thank you for the quoted Polaris charter lay/can information, bunker quantities at the time of withdrawal, and the Grand China withdrawal notice you provided yesterday.  At the hearing last week, I thought you said the ship would be discharging in the U.S.  Under what contract is the vessel currently performing, if the Polaris contract is not to begin until March 21?  Where and when is the ship to discharge?
>
> I am disappointed you did not see fit to provide us with the Polaris charter party, which is already in your possession.  Please do so today and provide us with the other documents we requested as soon as possible.
>
> Jack

**Jack A. Greenbaum | Blank Rome LLP**
The Chrysler Building, 405 Lexington Avenue | New York, NY 10174-0208
Phone: 212.885.5284 | Fax: 917.332.3834 | Email: JGreenbaum@BlankRome.com

**From:** Greenbaum, Jack A.
**Sent:** Friday, March 04, 2011 5:29 PM
**To:** 'James.Power@hklaw.com'
**Cc:** Singleton II, Richard V.; Harwood, Jeremy J.O.
**Subject:** KLC/OLDENDORFF
**Importance:** High

James,

For the sake of good order, we recap here the documents Oldendorff requests KLC to produce <u>promptly</u> as directed by Judge Gerber.

1.  The KLC/Polaris charter party; the fixture recap and/or confirmation; all communications regarding the negotiation of the charter terms; the on-hire and/or delivery certificate; the on-hire bunker survey; all other bunker surveys performed during the Polaris charter party; the first hire account or invoice rendered by KLC to Polaris; and any other form of invoices for bunkers issued by KLC to Polaris.
2.  The vessel's ETA[s] at US ports and the documents reflecting the "laycan" to which you referred at the hearing.
3.  The engine room and bunker logs from the time the vessel was delivered into Oldendorff's service until the date the ship arrives in the U.S.
4.  All bunker delivery receipts from the time the vessel was delivered into Oldendorff's service until the date the ship arrives in the U.S.
5.  KLC's withdrawal notice to Grand China.
6.  Any bunker survey performed upon the withdrawal of the Vessel from Grand China.

As you already have the Polaris charter party, the documents regarding arrival and the withdrawal notice, we request these be provided no later than Monday in compliance with the judge's directive for prompt production.  There is no rule of law or custom that permits you to wait until Oldendorff produces documents you have not even requested yet, the judge made no such stipulation this morning, and the judge's Case Management Order provides for <u>expedited</u> discovery.  See paragraph 24.

Regards,

Jack

**Jack A. Greenbaum | Blank Rome LLP**
The Chrysler Building, 405 Lexington Avenue | New York, NY 10174-0208
Phone: 212.885.5284 | Fax: 917.332.3834 | Email: JGreenbaum@BlankRome.com

*********************************************************************************************

This message and any attachments may contain confidential or privileged information and are only for the use of the intended recipient of this message. If you are not the intended recipient, please notify the sender by return email, and delete or destroy this and all copies of this message and all attachments. Any unauthorized disclosure, use, distribution, or reproduction of this message or any attachments is prohibited and may be unlawful.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Any Federal tax advice contained herein is not intended or written to be used, and cannot be used by you or any other person, for the purpose of avoiding any penalties that may be imposed by the Internal Revenue Code. This disclosure is made in accordance with the rules of Treasury Department Circular 230 governing standards of practice before the Internal Revenue Service. Any written statement contained herein relating to any Federal tax transaction or matter may not be used by any person without the express prior written permission in each instance of a partner of this firm to support the promotion or marketing of or to recommend any Federal tax transaction(s) or matter(s) addressed herein.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

To ensure compliance with Treasury Regulations (31 CFR Part 10, Sec. 10.35), we inform you that any tax advice contained in this correspondence was not intended or written by us to be used, and cannot be used by you or anyone else, for the purpose of avoiding penalties imposed by the Internal Revenue Code.

NOTE: This e-mail is from a law firm, Holland & Knight LLP ("H&K"), and is intended solely for the use of the individual(s) to whom it is addressed. If you believe you received this e-mail in error, please notify the sender immediately, delete the e-mail from your computer and do not copy or disclose it to anyone else. If you are not an existing client of H&K, do not construe anything in this e-mail to make you a client unless it contains a specific statement to that effect and do not disclose anything to H&K in reply that you expect it to hold in confidence. If you properly received this e-mail as a client, co-counsel or retained expert of H&K, you should maintain its contents in confidence in order to preserve the attorney-client or work product privilege that may be available to protect confidentiality.

## Harwood, Jeremy J.O.

**From:** Greenbaum, Jack A.
**Sent:** Wednesday, March 09, 2011 5:10 PM
**To:** Singleton II, Richard V.; Harwood, Jeremy J.O.
**Subject:** FW: KLC/OLDENDORFF

**Jack A. Greenbaum | Blank Rome LLP**
The Chrysler Building, 405 Lexington Avenue | New York, NY 10174-0208
Phone: 212.885.5284 | Fax: 917.332.3834 | Email: JGreenbaum@BlankRome.com

**From:** James.Power@hklaw.com [mailto:James.Power@hklaw.com]
**Sent:** Wednesday, March 09, 2011 4:51 PM
**To:** Greenbaum, Jack A.
**Subject:** RE: KLC/OLDENDORFF

Jack:

The request has been made.

Regards,
James

**James Power | Holland & Knight**
Partner
31 West 52nd Street | New York NY 10019
Phone 212.513.3494 | Fax 212.385.9010
james.power@hklaw.com | www.hklaw.com

Add to address book | View professional biography

**From:** Greenbaum, Jack A. [mailto:jgreenbaum@BlankRome.com]
**Sent:** Wednesday, March 09, 2011 4:47 PM
**To:** Power, James H (NYC - X73494)
**Cc:** Singleton II, Richard V.; Harwood, Jeremy J.O.
**Subject:** RE: KLC/OLDENDORFF

Thanks. When can we expect the fixture confirmation/recap and negotiating communications?

**Jack A. Greenbaum | Blank Rome LLP**
The Chrysler Building, 405 Lexington Avenue | New York, NY 10174-0208
Phone: 212.885.5284 | Fax: 917.332.3834 | Email: JGreenbaum@BlankRome.com

**From:** James.Power@hklaw.com [mailto:James.Power@hklaw.com]
**Sent:** Wednesday, March 09, 2011 4:38 PM
**To:** Greenbaum, Jack A.
**Subject:** RE: KLC/OLDENDORFF

Jack:

Please see attached form Polaris charter which I understand is in use. I will try and get you and executed copy if available. I continue to try and seek answers to your questions.

James

**James Power | Holland & Knight**
Partner
31 West 52nd Street | New York NY 10019
Phone 212.513.3494 | Fax 212.385.9010
james.power@hklaw.com | www.hklaw.com

Add to address book | View professional biography

**From:** Greenbaum, Jack A. [mailto:jgreenbaum@BlankRome.com]
**Sent:** Tuesday, March 08, 2011 12:14 PM
**To:** Power, James H (NYC - X73494)
**Cc:** Singleton II, Richard V.; Harwood, Jeremy J.O.
**Subject:** RE: KLC/OLDENDORFF

James,

Thank you for the quoted Polaris charter lay/can information, bunker quantities at the time of withdrawal, and the Grand China withdrawal notice you provided yesterday. At the hearing last week, I thought you said the ship would be discharging in the U.S. Under what contract is the vessel currently performing, if the Polaris contract is not to begin until March 21? Where and when is the ship to discharge?

I am disappointed you did not see fit to provide us with the Polaris charter party, which is already in your possession. Please do so today and provide us with the other documents we requested as soon as possible.

Jack

**Jack A. Greenbaum | Blank Rome LLP**
The Chrysler Building, 405 Lexington Avenue | New York, NY 10174-0208
Phone: 212.885.5284 | Fax: 917.332.3834 | Email: JGreenbaum@BlankRome.com

**From:** Greenbaum, Jack A.
**Sent:** Friday, March 04, 2011 5:29 PM
**To:** 'James.Power@hklaw.com'
**Cc:** Singleton II, Richard V.; Harwood, Jeremy J.O.
**Subject:** KLC/OLDENDORFF
**Importance:** High

James,

For the sake of good order, we recap here the documents Oldendorff requests KLC to produce <u>promptly</u> as directed by Judge Gerber.

1.  The KLC/Polaris charter party; the fixture recap and/or confirmation; all communications regarding the negotiation of the charter terms; the on-hire and/or delivery certificate; the on-hire bunker survey; all other bunker surveys performed during the Polaris charter party; the first hire account or invoice rendered by KLC to Polaris; and any other form of invoices for bunkers issued by KLC to Polaris.
2.  The vessel's ETA[s] at US ports and the documents reflecting the "laycan" to which you referred at the hearing.

3. The engine room and bunker logs from the time the vessel was delivered into Oldendorff's service until the date the ship arrives in the U.S.
4. All bunker delivery receipts from the time the vessel was delivered into Oldendorff's service until the date the ship arrives in the U.S.
5. KLC's withdrawal notice to Grand China.
6. Any bunker survey performed upon the withdrawal of the Vessel from Grand China.

As you already have the Polaris charter party, the documents regarding arrival and the withdrawal notice, we request these be provided no later than Monday in compliance with the judge's directive for prompt production. There is no rule of law or custom that permits you to wait until Oldendorff produces documents you have not even requested yet, the judge made no such stipulation this morning, and the judge's Case Management Order provides for <u>expedited</u> discovery. See paragraph 24.

Regards,

Jack

**Jack A. Greenbaum | Blank Rome LLP**
The Chrysler Building, 405 Lexington Avenue | New York, NY 10174-0208
Phone: 212.885.5284 | Fax: 917.332.3834 | Email: JGreenbaum@BlankRome.com

*************************************************************************************************

This message and any attachments may contain confidential or privileged information and are only for the use of the intended recipient of this message. If you are not the intended recipient, please notify the sender by return email, and delete or destroy this and all copies of this message and all attachments. Any unauthorized disclosure, use, distribution, or reproduction of this message or any attachments is prohibited and may be unlawful.

*************************************************************************************************

Any Federal tax advice contained herein is not intended or written to be used, and cannot be used by you or any other person, for the purpose of avoiding any penalties that may be imposed by the Internal Revenue Code. This disclosure is made in accordance with the rules of Treasury Department Circular 230 governing standards of practice before the Internal Revenue Service. Any written statement contained herein relating to any Federal tax transaction or matter may not be used by any person without the express prior written permission in each instance of a partner of this firm to support the promotion or marketing of or to recommend any Federal tax transaction(s) or matter(s) addressed herein.

*************************************************************************************************

To ensure compliance with Treasury Regulations (31 CFR Part 10, Sec. 10.35), we inform you that any tax advice contained in this correspondence was not intended or written by us to be used, and cannot be used by you or anyone else, for the purpose of avoiding penalties imposed by the Internal Revenue Code.

NOTE: This e-mail is from a law firm, Holland & Knight LLP ("H&K"), and is intended solely for the use of the individual(s) to whom it is addressed. If you believe you received this e-mail in error, please notify the sender immediately, delete the e-mail from your computer and do not copy or disclose it to anyone else. If you are not an existing client of H&K, do not construe anything in this e-mail to make you a client unless it contains a specific statement to that effect and do not disclose anything to H&K in reply that you expect it to hold in confidence. If you properly received this e-mail as a client, co-counsel or retained expert of H&K, you should maintain its contents in confidence in order to preserve the attorney-client or work product privilege that may be available to protect confidentiality.

# EXHIBIT C

Jack:

Please see attached form Polaris charter which I understand is in use. I will try and get you and executed copy if available.   I continue to try and seek answers to your questions.

James

**James Power | Holland & Knight**
Partner
31 West 52nd Street | New York NY 10019
Phone 212.513.3494 | Fax 212.385.9010
james.power@hklaw.com | www.hklaw.com

Add to address book | View professional biography

**From:** Greenbaum, Jack A. [mailto:jgreenbaum@BlankRome.com]
**Sent:** Tuesday, March 08, 2011 12:14 PM
**To:** Power, James H (NYC - X73494)
**Cc:** Singleton II, Richard V.; Harwood, Jeremy J.O.
**Subject:** RE: KLC/OLDENDORFF

James,

Thank you for the quoted Polaris charter lay/can information, bunker quantities at the time of withdrawal, and the Grand China withdrawal notice you provided yesterday.  At the hearing last week, I thought you said the ship would be discharging in the U.S.  Under what contract is the vessel currently performing, if the Polaris contract is not to begin until March 21?  Where and when is the ship to discharge?

I am disappointed you did not see fit to provide us with the Polaris charter party, which is already in your possession.  Please do so today and provide us with the other documents we requested as soon as possible.

Jack

1

**Jack A. Greenbaum | Blank Rome LLP**
The Chrysler Building, 405 Lexington Avenue | New York, NY 10174-0208
Phone: 212.885.5284 | Fax: 917.332.3834 | Email: JGreenbaum@BlankRome.com

**From:** Greenbaum, Jack A.
**Sent:** Friday, March 04, 2011 5:29 PM
**To:** 'James.Power@hklaw.com'
**Cc:** Singleton II, Richard V.; Harwood, Jeremy J.O.
**Subject:** KLC/OLDENDORFF
**Importance:** High

James,

For the sake of good order, we recap here the documents Oldendorff requests KLC to produce <u>promptly</u> as directed by Judge Gerber.

1.  The KLC/Polaris charter party; the fixture recap and/or confirmation; all communications regarding the negotiation of the charter terms; the on-hire and/or delivery certificate; the on-hire bunker survey; all other bunker surveys performed during the Polaris charter party; the first hire account or invoice rendered by KLC to Polaris; and any other form of invoices for bunkers issued by KLC to Polaris.
2.  The vessel's ETA[s] at US ports and the documents reflecting the "laycan" to which you referred at the hearing.
3.  The engine room and bunker logs from the time the vessel was delivered into Oldendorff's service until the date the ship arrives in the U.S.
4.  All bunker delivery receipts from the time the vessel was delivered into Oldendorff's service until the date the ship arrives in the U.S.
5.  KLC's withdrawal notice to Grand China.
6.  Any bunker survey performed upon the withdrawal of the Vessel from Grand China.

As you already have the Polaris charter party, the documents regarding arrival and the withdrawal notice, we request these be provided no later than Monday in compliance with the judge's directive for prompt production. There is no rule of law or custom that permits you to wait until Oldendorff produces documents you have not even requested yet, the judge made no such stipulation this morning, and the judge's Case Management Order provides for <u>expedited</u> discovery. See paragraph 24.

Regards,

Jack

**Jack A. Greenbaum | Blank Rome LLP**
The Chrysler Building, 405 Lexington Avenue | New York, NY 10174-0208
Phone: 212.885.5284 | Fax: 917.332.3834 | Email: JGreenbaum@BlankRome.com

*********************************************************************************************

This message and any attachments may contain confidential or privileged information and are only for the use of the intended recipient of this message. If you are not the intended recipient, please notify the sender by return email, and delete or destroy this and all copies of this message and all attachments. Any unauthorized disclosure, use, distribution, or reproduction of this message or any attachments is prohibited and may be unlawful.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Any Federal tax advice contained herein is not intended or written to be used, and cannot be used by you or any other person, for the purpose of avoiding any penalties that may be imposed by the Internal Revenue Code. This disclosure is made in accordance with the rules of Treasury Department Circular 230 governing standards of practice before the Internal Revenue Service. Any written statement contained herein relating to any Federal tax transaction or matter may not be used by any person without the express prior written permission in each instance of a partner of this firm to support the promotion or marketing of or to recommend any Federal tax transaction(s) or matter(s) addressed herein.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

To ensure compliance with Treasury Regulations (31 CFR Part 10, Sec. 10.35), we inform you that any tax advice contained in this correspondence was not intended or written by us to be used, and cannot be used by you or anyone else, for the purpose of avoiding penalties imposed by the Internal Revenue Code.

NOTE: This e-mail is from a law firm, Holland & Knight LLP ("H&K"), and is intended solely for the use of the individual(s) to whom it is addressed. If you believe you received this e-mail in error, please notify the sender immediately, delete the e-mail from your computer and do not copy or disclose it to anyone else. If you are not an existing client of H&K, do not construe anything in this e-mail to make you a client unless it contains a specific statement to that effect and do not disclose anything to H&K in reply that you expect it to hold in confidence. If you properly received this e-mail as a client, co-counsel or retained expert of H&K, you should maintain its contents in confidence in order to preserve the attorney-client or work product privilege that may be available to protect confidentiality.

# TIME Charter

GOVERNMENT FORM
*Approved by the New York Produce Exchange*
November 6th 1913-Amended October 20th,1921;August 6th,1931; October 3rd,1946

1   **This Charter Party**, made and concluded in ..................................... th day of .........19

2   Between .........***KOREA LINE CORPORATION*** as.....................................................

3   Owners of the good..................Steamship/Motorship *M.V. " "* of *(See Vessel's Description Rider clause 29)* ............

4   of........................... tons gross register, and............tons net register, having engines of............indicated horse power

5   and with hull, machinery and equipment in a thoroughly efficient state, and classed .......................... ............................

6   at ..................of about .........................cubic feet bale capacity, and about................................tons of 2240lbs

7   deadweight capacity (cargo and bunkers, including fresh water and stores not exceeding one and one half present of ship's deadweight capacity;

8   allowing a minimum of fifty tons) on a draft of....... feet......inches on ...... Summer freeboard, inclusive of permanent bunkers,

9   which are of the capacity of about............................tons of fuel, and capable of steaming, fully laden, under good weather

10   conditions about...... knots on a consumption of about ............tons of best Welsh coal best grade fuel oil best grade Diesel oil,

11   now ...............................................................................

12   ...........and ...... ........................ Charterers of the city of...... ....................

13     Witnesseth, That the said Owners agree to let, and the said Charterers agree to hire the said vessel, from the time of delivery, for

14   about *time charter period of minimum 59 to maximum 61 months in Charterer's option trading always via safe port(s), safe*

15   *berth(s),safe anchorage(s), always afloat and always with Institute Warranty Limits with Iron Ore in bulk always excluding DRI/DRIP/HBI/Sponge Iron or Coal in bulk which to be of a type having a history of shipment under similar circumstances without problems arising from methane emission or spontaneous heating. Cargo be loaded in all holds and Masters instructions to be followed at all times and always within latest IMO recommendations.* within below mentioned trading limits.

16   Charterers to have liberty to sublet the vessel for all or any part of the time covered by this Charter, but Charters remaining responsible for

17   the fulfillment of this Charter Party. *Acceptance of delivery shall not constitute a waiver of Owners' obligations under this Charter.*

18   Vessel to be placed at the disposal of the Charterers , at *as per Rider Clause 35*

19   ...................................................

20   in such dock or at such wharf or palace (where she may safely be, always afloat, at all times of tide, except as otherwise provided in clause No.6) as

21   the Charterers may direct .If such dock, wharf or place be not available time to count as provided for in clause No5. Vessel on her delivery to be

22   ready to receive cargo with clean swept holds and tight ,staunch, strong and in every way fitted for the service, having water ballast, winches and

23   donkey boiler with sufficient steam power , or if not equipped with donkey boiler, then other power sufficient to run all the winches at one and the same

24   time (and with full complement of officers, seamen, engineers and firemen for a vessel of her tonnage),to be employed ,in carrying lawful merchan-

25   dise, including petroleum or its products, in proper containers, excluding *as per Rider Clause 33*

26   (vessel is not to be employed in the carriage of Live Stock, but Charterers are to have the privilege of shipping a small number on deck at their risk

27   all necessary fittings and other requirements to be for account of Charterers ), in such lawful trades, between safe port and/or ports in British North

28   America and /or United States of America, and/or Central America, and /or Caribbean Sea, and /or Gulf of Mexico, and/or

29   Mexico, and /or South America ...................................................................................and /or Europe

30   and /or Africa, and/or Asia, and/or Australia , and/or Tasmania, and /or New Zealand , but excluding Magdalene River, River St. Lawrence between

31   October 31st and May 15th,Hudson Bay and all unsafe ports also excluding, when out of season, White sea, Black Sea and the Baltic

32   *As per Rider Clause 34*

33

34   .........................................................................

35   as the Charterers or their Agents shall direct, on the following conditions:

36     1. That the owners shall provide and pay for all provisions, wages and consular shipping and discharging fees of the Crew; *See also Rider Clause 39* shall pay for the

37   insurance of the vessel ,also for all the cabin ,deck, engine-room and other necessary stores, including boiler water, and maintain her class and keep

38   the vessel in a thoroughly efficient state in hull, *holds,* machinery and equipment for and during the service.

39    2. That *whilst the vessel is on hire* the Charterers shall provide and pay for all the fuel except as otherwise agreed , Port *and Canal* Charges, Pilotages, *as required by Owners/Master as if the vessel were trading for own account,* Agencies, Commissions,

40    Consular Charges (except those pertaining to the Crew *and vessel's flag*), and all other usual expenses except those before stated, but when the vessel puts into

41    a port for causes for which vessel is responsible, then all such charges incurred shall be paid by the Owners. *Charterers to pay required tugboat assistance in port and approaches thereto as customary for size of vessel according to winds and tide* ~~Fumigations ordered because of~~

42    ~~illness of the crew to be for owners account. Fumigations ordered because of cargoes carried or ports visited while vessel is employed under this~~

43    ~~Charter to be for Charterers account. All other fumigations to be for Charterers account after vessel has been on charter for a continuous period~~

44    ~~of six months or more.~~ *Owners warrant that the vessel's ropes are and will remain suitable for calling Dampier and/or Port Walcott throughout the currency of this Charter.*

45    Charterers are to provide necessary dunnage and shifting boards, also any extra fittings *and Charterers to pay for rental of additional mooring ropes provided same are required by local regulations,* requisite for a special trade or unusual cargo, but

46    Owners to allow them the use of any dunnage and shifting boards already aboard vessel.Charterers to have the privilege of using shifting boards

47    for dunnage, they making good any damage thereto

48    3. ~~That the Charterers ,at the port of delivery, and the Owners, at the port of re delivery , shall take over and pay for all fuel remaining on~~

49    ~~board the vessel at the current prices in the respective ports, the vessel to be delivered with not less than ........................tons and not more than~~

50    ~~..............tons and to be re-delivered with not less than .................tons and not more than....................................tons.~~

51    4. That the Charterers shall pay for the use and hire of the said Vessel at the rate of *USD ,000 daily including overtime*

52    Hire to be paid by Charterers every 15 days in advance except *1ˢᵗ hire which to be paid within 3 banking days after vessels delivery together with value of BOD.*...............................United States Currency ~~per ton on vessel's total~~ *deadweight* ~~carrying capacity ,including bunkers and~~

53    ~~stores ,on .summer freeboard, per Calendar Month,~~ commencing on and from the day of her delivery, as aforesaid, and at

54    and after the same rate for any part of a ~~month~~ *day*; hire to continue until the hour of her re-delivery in like good order and condition, ordinary

55    wear and tear excepted ,to the Owners(unless lost)~~at~~ *as per Rider Clause 35*

56    .........................unless otherwise mutually agreed. Charterers are to give Owners not less than    ....days

57    notice of vessels expected date of re-delivery, and probable port. *As per Rider Clause 35.*

58    5. Payment of said hire to be made *every 15 days in advance to: To be advised* ~~in New York~~ in cash in United States Currency, ~~semi-monthly in advance,~~ and for the last *15 days* ~~half month~~ or    ,

59    part of same the approximate amount of hire, and should same not cover the actual time, hire is to be paid for the balance day by day, as it becomes

60    due, if so required by Owners, unless bank guarantee or deposit is made by the Charterers, otherwise failing the punctual and regular payment of the

61    hire, or bank guarantee, or on any breach of this Charter Party, the Owners shall be liberty to withdraw the vessel from the service of the charterers,

62    without prejudice to any claim they (the Owners) may otherwise have on the Charterers. ~~Time to count from 7 am on the working day~~

63    ~~following that on which written notice of readiness has been given to Charterers or their Agents before 4 p.m., but if required by Charteres, they~~

64    ~~to have the privilege of using vessel at once, such time used to count as hire~~

65    Cash for vessel's ordinary disbursements at any port may be advanced as required by the Captain, by the Charterers or their Agents subject

66    to 2 ½% commission and such advances shall be deducted from the hire. The Charterers, however, shall in no way be responsible for the application

67    of such advances *and in case Owners' outlays are disputed, Owners to settle disputed items with agents involved directly.*

68    6. That the cargo or cargoes be laden and/or is charged in any dock or at any wharf *or anchorage* or place that Charterers or their Agents may

69    direct, provided the vessel can safely lie always afloat at any time of tide, ~~except at such places where it is customary for similar size vessel to safely~~

70    ~~lie aground.~~

71    7. That the whole reach of the Vessel's Hold, Decks, and usual places of loading(not more than she can reasonably stow and carry), also

72    accommodations for Supercargo, if carried, shall be at the Charterers's disposal, reserving only proper and sufficient space for Ship's officers, crew,

73    tackle, apparel, furniture, provisions, stores and fuel. ~~Charterers have the privilege of passengers as far accommodations allow, Charterers~~

74 ~~paying owners ................. per day per passenger for accommodations and meals. However, it is agreed that in case any fines or extra expenses are~~

75 ~~incurred in the consequences of the carriage of passengers, Charterers are to bear such risk and expense.~~

76     8. That the Captain shall prosecute his voyages with the utmost despatch , and shall render all customary assistance with ship's crew, and

77 boat. The Captain (although appointed by the Owners),shall be under the orders and direction of the Charterers as regards employment and

78 agency; and Charterers are to load, stow, ~~and~~ trim *tally and discharge* the cargo at their expense under the supervision of the Captain, who is to sign Bills of Lading for

79 cargo as presented, in conformity with Mate's or Tally Clerk's receipts *without prejudice to this Charter Party.*

80     9. That if the Charterers shall have reason to be dissatisfied with the conduct of the Captain, Officers, or Engineers, the Owners shall on

81 receiving particulars of the complaint, investigate the same, and , if necessary, make a change in the appointments.

82     10. That the Charterers shall have permission to appoint a Supercargo, who shall accompany the vessel and see that voyages are prosecuted

83 with the utmost despatch. He is to be furnished with free accommodation, and same fare as provided for Captain's table, Charterers paying at the

84 rate of $1.00 per day. Owners to victual Pilots and Customs Officers, and also, when authorized by Charteres or their Agents, to victual Tally

85 Clerks, Stevedore's Foreman, etc. Charterers paying at the current rate per meal, for all such victualling *as per Rider Clause 74.*

86     11. That the Charterers shall furnish the captain from time to time with all requisite instructions and sailing directions, in writing, *Owners to undertake to supply Charterers with abstracts of vessel's logbook when requested.* ~~and the~~

87 ~~captain shall keep a full and correct Log of the voyage or voyages, which are to be patent to the Charterers or their Agents, and furnish the Char-~~

88 ~~terers, their Agents or Supercargo, when required, with a true copy of daily Logs, showing the course of the vessel and distance run and the con-~~

89 ~~sumption of fuel.~~

90     12. That the captain shall use diligence ~~in caring~~ for the *care and* ventilation of the cargo.

91     13. ~~That the Charterers shall have the option of continuing this charter for a further period of~~ .................................

92 ...............................................................................................................................

93 ~~on giving written notice thereof to the Owners or their Agents~~ ..........................~~days previous to the expiration of the first named term, or any declared option~~

94     14. ~~That if required by Charterers, time~~ *Charter Party* not to commence before *0001hrs 1ˢᵗ September,2009 in local time*............and should vessel

95 not have given written notice of readiness on or before *2359hrs 30ᵗʰ November,2009 in local time......* ~~but not later than 4p.m.~~ Charterers or

96 their Agents to have the option of canceling this Charter at any time not late than the day of vessel's readiness. *Owners to keep Charterers closely informed about the building progress and Owners to tender 90/60/30/20/15/10/5 days approx and 3/1 day(s) definite delivery notice. And Owners to narrow laycan to 30 days spread with 90days delivery notice; Owners to narrow laycan to 15days spread with 60days delivery notice; Owners to narrow laycan to 10days spread with 30days delivery notice.*

97     15. That in the event of the loss of time from deficiency of men or stores, fire, breakdown or damages to hull , machinery or equipment,

98 grounding, detention by average accidents to ship or cargo, drydocking for the purpose of examination or painting bottom, or by any other cause

99 preventing the full working of the vessel, the payment of hire shall cease for the time thereby lost *until the vessel has returned to the same or equivalent position*; and if upon the voyage the speed be reduced by

100 defect in or breakdown of any part of her hull, machinery or equipment, the time so lost, and the cost of any extra fuel consumed in consequence

101 thereof, and all extra expenses shall be deducted from the hire.

102     16. That should the Vessel be lost, money paid in advance and not earned (reckoning from the date of loss or being last heard of ) shall be

103 returned to the Charterers at once. The act of God, enemies, fire restraint of Princes, Rulers and People , and all dangers and accidents of the Seas,

104 Rivers, Machinery, Boilers and Steam Navigation, and errors of Navigation throughout this Charter Party, always mutually excepted.

105     The vessel shall have the liberty to sail with or without pilots, to tow and to be towed, to assist vessels in distress, and deviate for the

106 purpose of saving life and property.

107     17. That should any dispute arise ~~between Owners and the Charterers,~~ the matter in dispute *however* shall be referred to three persons at *London* ~~New York;~~

108 one to be appointed by each of the parties hereto, and the third by the two so chosen; their decision or that of any two of them; shall be final, and for

109 the purpose of enforcing any award, this agreement may be made a rule of the Court. The Arbitrators shall be *shipping/* commercial men *who are to be members of the LMAA.*

110 18. That the Owners shall have a lien upon all cargoes, and all sub-freights, *and demurrage and sub-hires* for any amounts due under this Charter, including General Average

111 contributions, and the Charterers to have a lien on the ship for all monies paid in advance and not earned, and over paid hire or excess

112 deposit to be returned at once. Charterers will not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agents, which

113 might have priority over the title and interest of the owners in the vessel.

114 19. That all derelicts and savage shall be for Owners' and Charterers' equal benefit after deducting Owners' and Charterers expenses and

115 crew's proportion. General Average shall be adjusted, stated and settled, according to ~~Rules 1 to 15, inclusive, 17 to 22, inclusive, and Rule F of~~

116 York-Antwerp Rules *1994* ~~1924,~~at such port or place in the United States as may be selected by the carrier, and as to matters not provided for by these

117 Rules, according to the laws and usages at the port of *London* ~~New York. In such adjustment disbursements in foreign currencies shall be exchanged into~~

118 ~~Untied States money at the rate prevailing on the dates made and allowance for damage to cargo claimed in foreign currency shall be converted at~~

119 ~~The rate prevailing on the last day of discharge at the port or place of final discharge of such damaged cargo from the ship. Average agreement or~~

120 ~~bond and such additional security, as may be required by the carrier, must be furnished before delivery of the goods. Such cash deposit as the carrier~~

121 ~~or his agents may deem sufficient as additional security for the contribution of the goods and for any salvage and special charges thereon ,shall, if~~

122 ~~required ,be made by the goods, shippers , consignees or owners of the goods to the carrier before delivery. Such deposit shall ,at the option of the~~

123 ~~carrier, be payable in United States money and be remitted to the adjuster. When so remitted the deposit shall be held in a special account at the~~

124 ~~place of adjustment in the name of the adjuster pending settlement of the General Average and refunds or credit balances, if any , shall be paid in~~

125 ~~United States money.~~ *Hire not to contribute to General Average.*

126 ~~In the event of accident, damage, or disaster, before or after commencement of the voyage resulting from any cause whatsoever;~~

127 ~~whether due to negligence or not ,for which, or for the consequence of which, the carrier is not responsible, by statue, contract, or otherwise, the~~

128 ~~goods, the shipper and the shipper and the consignee, jointly and severally, shall contribute with the carrier in general average to the payment of any sacrifices~~

129 ~~losses, or expenses of a general average nature that may be made or incurred , and shall pay salvage and special charges incurred in respect of the~~

130 ~~goods. If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully and in the same manner as if such salving ship or~~

131 ~~ships belonged to strangers.~~

132 ~~Provisions as to General Average in accordance with the above are to be included in all bills of issued hereunder.~~

133 20. Fuel used by the vessel while off hire, ~~also for cooking, condensing water, or for grates and stoves to be agreed to as to quantity,~~ and the

134 cost of replacing same, to be allowed by Owners.

135 21. ~~That as the vessel may be from time to time employer in tropical water during the term of this Charter, Vessel is to be docked at a~~

136 ~~convenient place, bottom and pointed whenever Charterers and Captain think necessary, at least once in every six months, reckoning from~~

137 ~~time of lost paining, and payment of the hire to be suspended until she is again in proper state foe the service.~~

138 ..........................................................................................................................................

139 ..........................................................................................................................................

140 22. ~~Owners shall maintain the gear of the ship as fitted, providing gear (for all derricks ) capable of handing lift up to three tons, also~~

141 ~~providing ropes, falls, slings and blocks. If vessel is fitted with derricks capable of handing heavier lifts. Owners are to provide necessary gear for~~

142 ~~same, otherwise equipment and gear for heavier lifts shall be for Charterers' account. Owners also to provide on the vessel lanterns and oil for~~

143 ~~night work, and vessel to give use of electric light when so fitted, but any additional lights over these on board to be at Charterers' expense. The~~

144 ~~Charterers to have the use of any gear on board the vessel.~~

145     23. ~~Vessel to work night and day, if required by Charterers, and all winches to be at Charterers' disposal during loading~~
    ~~and discharging:~~

146     ~~steamer to provide one winchman per hatch to work winches day and night , as required, Charterers agreeing to pay officers,~~
    ~~engineers, winchmen,~~

147     ~~deck hands and donkeymen for overtime work done in accordance with the working hours and rates stated in the ship's articles.~~
    ~~If the rules of the~~

148     ~~port, or labor unions, prevent crew from driving winches, shore Winchmen to be paid by Charterers. In the event of a~~
    ~~disabled winch or winches, or~~

149     ~~insufficient power to operate winches, Owners to pay for shore engine, or engines, in lieu thereof, if required ,and pay any loss~~
    ~~of time occasioned~~

150     ~~thereby.~~ See Clause 68.

151     24.. It is also mutually agreed that this Charter is subject to all the terms and all the exemptions from liability container

152   in the act of Congress of the United States approved on the 13th day of February ,1893, end en titled "An Act relating to Navigation of Vessels

153   etc., in respect of all cargo shipped under this charter to or from the United States of America. It is further subject to the following *Clause which shall be deemed incorporated herein* ~~clauses, both~~

154   ~~of which are to be included in all bills of lading issued hereunder:~~

155                     U. S. A. Clause Paramount

156     This ~~bill of lading~~ *Charter Party* shall have effect subject to the provisions of the Carriage of Good by Sea Act of the United States, approved April

157   16, 1936 .which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the carrier of

158   any of its rights or immunities or an increase of any of its responsibilities or liabilities under said Act. If any term of this bill of lading

159   be repugnant to said Act to any extent, such term shall be void to that extent , but no further

160                     ~~Both to Blame Collision Clause~~

161     ~~If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or~~
    ~~default of the Master,~~

162     ~~mariner, pilot or the servants of the Carrier in the navigation or in the management of the ship, the owners of the goods~~

163     ~~carried hereunder will indemnify the Carrier against all lose or liability to the other non carrying ship or her owners~~
    ~~in so far as such less~~

164     ~~or liability represents loss of ,or damage to , or any claim whatever of the owners of said goods, paid or payable by the~~
    ~~other or non carrying~~

165     ~~ship or her owners to the owners of said goods and set off , recouped or recovered by the other or non carrying ship~~
    ~~or her~~

166     ~~owners as part of their claim against the carrying ship or carrier.~~

167     25. The vessel shall not be required to *force ice nor follow ice-breakers*, enter any ice-bound port, or any port where lights or light-ships have been or are about to be with-

168   drawn by reason of ice ,or where there is risk that in the ordinary course of things the vessel will not be able on account of ice to safely enter the

169   port or to get out after having completed loading or discharging .

170     26. Nothing herein stated is to be construed as a demise of the vessel to the Time Charterers. The owners to remain responsible for the

171   navigation of the vessel, insurance, crew, and all other matters, same as when trading for their own account.

172     27. A commission of ~~2 1/2~~ *0.625* per cent is payable by the Vessel and Owners to *Simpson Spence & Young Shanghai Co., Ltd. and 0.625% to Ildo Chartering Corporation, Seoul, S. Korea....*

173   .............................................................................................................................................................

174   on hire earned and paid under this Charter, and also upon any continuation or extension of this Charter.

175     28. An address commission of *3.75* ~~2 1/2~~ per cent payable to *Charterers* on the hire earned and paid under this Charter.

*Clauses 29 – 109 inclusive and Vessel's Description, as attached hereto, are deemed to be fully incorporated in this Charter Party.*

*OWNERS:*                                       *CHARTERERS:*

**29. Vessel's Description:**

1. – MV" KLC TBN"

2   Vessel classed Lloyds or equivalent for duration of this Charter Party, equivalent being an IACS member.

3   Vessel to be Rightship approved and remain so throughout the currency of the Charter Party

**30. Weather Routes**
Charterers may supply independent routing company advice to the Master, during voyages specified by the Charterers. The Master to comply with the reporting procedure of the routing service. The vessel shall be capable at all times during the currency of this Charter Party of keeping speed and consumption as per the Description Clause always subject to good weather and no adverse current and safe navigation permitting. For the purpose of this Charter Party good weather condition in wind speed not exceeding but including Beaufort Force 4 and Douglas Sea State 3. Evidence of weather conditions, to be taken from the vessel's deck logs and independent weather Bureau reports and in case amicable settlement cannot be reached then the matter to be decided by Arbitration.

**31. Diesel Distillate Oil in Port:**
The vessel is to have the liberty of using Diesel Distillate Oil when entering and leaving port and for manoeuvring in shallow narrow waters, provided such usage is determined to be essential for the same manoeuvring of the vessel, always at the discretion of the Master.

**32. Communication Equipment:**
The vessel shall, as a minimum, be equipped with wireless telegraph and VHF telephone to comply with International regulations and GMDSS and to allow vessel to communicate with land stations. Master, Senior Officers and Radio Officer to be fully conversant with the English language.

**33. Permitted Cargoes:**
Cargo to be iron ore in bulk always excluding DRI/DRIP/HBI/Sponge Iron or coal in bulk which to be of a type having a history of shipment under similar circumstances without problems arising from methane emissions or spontaneous heating.  Cargo to be loaded in all holds and Master's instructions to be followed at all times and always within latest IMO recommendations.

**34. Trading:**
1.      Trading shall always be via safe port(s), safe berth(s), safe anchorage(s), safe installations, always afloat, always within Institute Warranty Limits.  Gypsy Moth areas always excluded.


2.      Trading Inclusions:
Trading shall always be via safe port(s), safe berth(s), safe anchorage(s), always afloat, always within Institute Warranty Limits. Following are the allowed trading countries / areas under this Charter Party:

Vietnam, Canada, U.S.A., Colombia, Mexico, Venezuela, Brazil, Argentina, Peru, Uruguay, Chile, Ecuador, Panama, Norway, Sweden, Finland, Denmark, Poland, Germany, Belgium, Netherlands, France, U.K., Eire, Portugal, Spain, Italy, former Yugoslavia, Greece, Bulgaria, Romania, Malta, Turkey (Turkish occupied Cyprus exduded), Morocco, Egypt, Mauritania, South Africa, India, Thailand, Singapore, Hong Kong, Indonesia, Malaysia, Philippines, Taiwan, Australia, People's Republic of China (no direct trade between People's Republic of China and Taiwan), South Korea, Japan, Russia, (C.I.S. Pacific always excluded), Suez Canal/International waters, International canals.

All other countries excluded.

During the currency of this Charter, the Charterers may request the Owners to permit to trade

1

other countries, which are not included in the above list for which Owners' approval shall not be unreasonably withheld.

3.      Any trading in areas declared as war zones by Lloyds/ship's Underwriters or banned by the U.N. are not allowed unless Owners' prior consent has been given and against Charterers paying any extra insurance premiums and any crew bonuses against Underwriters' original invoice but sent by fax or email.

4.      Under the political situation existing as at the date hereof, trading to the former Yugoslav states is not permitted, except Koper and Bakar and Bar which are permissible ports.

        If, during the currency of this Charter, the political situation changes to such an extent that normal business relationships are resumed and free and unhindered trading is resumed, Charterers can request Owners to permit such trading, for which Owners' approval shall not be unreasonably withheld.

5.      The vessel will not be forced to trade the countries which are not permitted by the law of the country of registry or Owners' domicile. In the event of new rules, regulations, of legislation being enacted in the country of flag or registration which materially affect the vessel's trading areas or flexibility, Owners and Charterers shall endeavour to reach a mutually satisfactory solution including the change of the vessel's flag or registry.

## 35. Delivery/Redelivery Range and Notices/Itinerary:

1.      Delivery: Delivery to be on dropping last outward sea pilot EX Builder's Yard, Daewoo S.Korea,at any time day or night Sundays and holidays included.
Vessel to be delivered to Charterers upon Owners taking delivery of vessel from ship builder without employment of any intermediate voyage.
Owners to keep Charterers closely informed about the building progress and Owners to tender 90/60/30/20/15/10/5 days approx and 3/1 day(s) definite delivery notice.

2.      Redelivery: Redelivery dropping last outward sea pilot one safe port Singapore/South Japan (not North of Tokyo Bay and always excluding Japan Sea side) including People's Republic of China, South Korea/Philippines/Malaysia/Taiwan, or in Charterers' option passing West bound off Cape Passero or Skaw or in Charterer's option passing Muscat outbound or Aden outbound, any time day or night, Sundays and Holidays included.

3.
        Charterers are to give Owners 20, 15, 10, 5 and 2 days final notice of redelivery.

        Charterers are to keep Owners duly informed of vessel's itinerary and any change of redelivery range.

4.      Charterers undertake to inform the Owners, during the period of Charter, as regards to the itinerary of the vessel and the name and full style of their Agents at ports of call whenever so required by the Owners.

## 36. Joint Survey:

On-hire survey at first load port for bunker/condition and off-hire survey at last discharge port for condition/bunker to be held jointly by Owners'/Charterers' independent surveyor and costs/time to be equally shared.

## 37. Hold Condition and Cleaning:

1.      Vessel on arrival at first loading port to be ready to receive Charterers' intended cargo with her cargo holds clean, swept, washed down, dried up, odourless, free of loose rust, rust scale and residues of previous cargoes to local authorities' satisfaction, failing which vessel is to be put off-hire pro rata until she is ready to pass the inspection and ready to load. All directly related extra expenses incurred to be borne by Owners. See Clause 41.

2.      Upon completion of discharge of each cargo, the crew shall render customary assistance in cleaning, fresh water and/or chemicals and equipment if required for hold cleaning to be provided and paid for by Charterers.

Any delay, cost, consequences or action against Owners or vessel arising from cleaning between Australian ports to be entirely at Charterers' time, risk and expense.

3.      The vessel is to be redelivered with her holds in like condition as on delivery. Charterers have the option to redeliver the vessel unclean as left by stevedores against paying US$8,000 in lieu of hold cleaning.

## 38. Bunkers:

Bunkers on delivery as on board but sufficient to reach Singapore.
Charterers option to supply their bunker prior delivery provided it is permitting by Shipyard.
Bunker on redelivery to be about same quantity as on delivery but sufficient to reach the nearest main bunkering port.
Bunker prices on delivery to be as per Owners contracted prices against supporting invoices.
Bunker prices on redelivery to be same prices as on delivery.

## 39. Owners' Expenses

Owners to provide and pay for all other expenses of Officers and crew including immigration fees and also all consular fees necessitated because of vessel's flag or nationality of Owners and lubricating oils. Vessel is to have on board all certificates necessary to comply with requirements at ports of call and canals for and during the service, failing which Owners are to be responsible for all time lost and expenses incurred thereby. Charterers are to pay for customary and port pilots.

## 40.  Insurance/ P and I Cover:

1.      Owners warrant that throughout the currency of this Charter Party the vessel shall be fully covered by leading insurance companies/international P and I Clubs acceptable to the Charterers against Hull and Machinery, War and Protection and Indemnity Risk. Costs of such cover to be at the sole expense of Owners.

2.      If required by the Charterers, prior to commencement of the Charter or at any other time, the Owners shall procure that the Managers of the Hull and Machinery insurance and the Protection and Indemnity Association shall give the Charterers proper evidence that the vessel is fully covered by the Owners and that all calls have been paid up to date.

3.      Insurance Full Style and Value:
Hull and Machinery: To be advised.
Protection and Indemnity Risks: To be advised.

## 41.      Intermediate Hold Cleaning

Upon completion of discharge of each intermediate cargo, if so instructed by Charterers, ship's crew shall render all customary assistance to clean cargo compartments in preparation for their next employment whenever possible, all cleaning to be performed concurrent with discharge operations and/or while vessel enroute to her next load port, weather, local regulations, trade union labour regulations and time permitting.

Charterers shall pay Owners US$600 per hold for sweeping/washing after discharge of all permitted cargoes. It is understood that crew will endeavour to do their best to clean holds but Owners/crew not to be responsible if holds fail a cleanliness inspection due to residues attributable to cargoes carried under this Charter.

Charterers to arrange at their time, risk and expense for removal/disposal of hold washing water, cargo garbage/residues if same not allowed to be disposed of or pumped overboard within territorial waters of that port/country.

Removal/disposal of cargo dunnage, separation materials and/or fittings to be performed in Charterers' time and at their risk and expense. Fresh water and/or chemicals and equipment (if required) for hold cleaning to be provided and paid for by Charterers.

Any delay, costs, consequences or action against Owners/vessel arising from cleaning between Australian ports to be entirely at Charterers' risk and expense.

## 42.      Withholdings:

Charterers are to have the right to withhold Owners' items and estimated amount for bunkers from the

penultimate and last hire payments, any balance for bunker value is to be settled in the final hire statement. Undisputed off-hires and actual Owners' disbursements supported by proper receipts or vouchers may be deducted by Charterers from the Charter hire during the period of the Charter Party. Such deductions will be finalized when proper statements/vouchers are submitted which is to be as soon as possible, otherwise as provided herein, hire shall be paid in full, without set-off or deduction of whatsoever nature.

### 43. Payment of Hire Delay
Referring to Lines 60 and 61 of NYPE printed form, where there is default of payment as specified, the Owners will notify the Charterers whereupon the Charterers shall make payment of the amount due without interest within three (3) working/banking days of notification from the Owners, failing which the Owners will have the right to withdraw the vessel from service of the Charterers, without prejudice to any claim the Owners may otherwise have on the Charterers under this Charter.

### 44. Taxes:
All taxes on cargo voyage freights are to be for Charterers' account except income tax and taxes on time charter hire levied in the country of vessel and/or her Owners' domicile. All dues, duties, charges and/or taxes on crew and/or stores are to be for Owners' account.

### 45. Stevedore Damage:
(a)   Notwithstanding anything contained herein to the contrary, the Charterers shall be liable to the Owners for all damage to the vessel caused by stevedores ("Stevedore Damage") and for losses, damages and expenses suffered by the Owners as a consequence of Stevedore Damage provided the Master has notified the Charterers and/or their agents in writing as soon as practical but no later than forty eight (48) hours after occurrence of such damage unless such damage is hidden, in which case hidden damage to be reported to Charterers or their agents as soon as practically possible following discovery but not later than loading cargo under the following voyage. Such notice to specify Stevedore Damage in detail and to invite Charterers to appoint a surveyor to assess the extent of the Stevedore Damage.

If possible, the Master shall endeavour to obtain written acknowledgement by the party causing Stevedore Damage, however the Charterers shall remain liable to the Owners for Stevedore Damage whether or not payment has been made by stevedores to the Charterers in respect of the Stevedore Damage.

(b)   In the event that, in the reasonable opinion of the Owners and class, Stevedore Damage affects the vessel's seaworthiness and/or the safety of the crew and/or trading capability of the vessel, the Charterers shall immediately (following notification of the damage) arrange for repair of such damage(s) at their time and expense and the vessel shall remain on-hire throughout the completion of such repairs and their approval (if required) by the vessel's Classification Society.

(c)   In the event that Stevedore Damage is not so serious as to affect the vessel's seaworthiness and/ or safety of the crew and/or trading capability, Charterers shall, no later than the earlier of either one hundred and eighty (180) days from the date of its occurrence or redelivery of the vessel, either (a) arrange for repair of the Stevedore Damage at their time and expense (the vessel to remain on hire as per (b) above), or (b) agree with Owners upon a lump sum cash settlement to fully compensate Owners for the reasonably estimated and agreed time and cost of repairs to be undertaken in respect of the Stevedore Damage. Owners undertake to keep Charterers fully informed of all procedures.

(d)   Stevedores shall be employed at Charterers' risk and paid for by the Charterers. It is understood that if agreed between Charterers and Owners that crew are to assist stevedores with cargo operations, the crew members are to be considered Charterers' servants in respect of stevedore damage(s) only.

### 46.   Grab Discharge:
Vessel is to be suitable for normal grab discharge and no cargo to be loaded in places inaccessible to grab discharge. Charterers are to have the privilege of using bulldozers in vessel's holds.

**47. Drydocking Clause:**
Owners have the right to place the vessel in Drydocking at their expense during the currency of this Charter at intervals of about 30 months after the vessel's delivery at shipyards or the vessel's last drydocking, for bottom cleaning and painting and/or repair as required by Class or dictated by circumstances, provided, However, that Owners have the right to place the vessel in drydock at any time in case of emergency. Charterers shall place the vessel at Owners' disposal at a safe port between Japan and Singapore after discharging cargoes for such periodical drydocking. Owners shall give 4(Four) months prior notice to Charterers regarding the placing of the vessel in drydock.

**48. Boycott:**
Should the vessel be boycotted, picketed, blacklisted or similar incident at any port or place by shore and/or port labour and/or tugboats and/or pilots and/or competent authority, by the terms and conditions on which members of the Officers, crew are employed, or by reason of vessel's flag and/or ownership, any directly related extra expenses incurred by Charterers at such port or place therefrom are to be for Owners' account and Charterers are entitled to put the vessel off-hire for any time lost.

**49. I.T.F:**
Owners guarantee that the vessel is, and will remain during the whole period of this Charter fully acceptable to the ITF as far as conditions of crew, employment contracts, wages, etc., are concerned. In the event that the vessel is delayed by reason of boycotts, strikes, labour stoppages or other actions by the ITF against the vessel due to employment conditions, time so lost shall be considered as off-hire and proven costs directly resulting therefrom are to remain for Owners' account.

**50. Arrest:**
Should the vessel be arrested during the currency of the Charter Party at the suit of any person having or purporting to have a claim against or any interest in the vessel, hire under this Charter Party shall not be payable in respect of any period whilst the vessel remains under arrest or remains unemployed as a result of such arrest. The clause shall be inoperative should the arrest be caused through any act or omission of the Charterers.

**51. Lack of Crew Members:**
Any time lost by the vessel by reason of one or more required crew members not being on board when the vessel is ready to sail, or by reason of a strike, stoppage or refusal to work by any crew is to be for Owners' account and expenses for keeping waiting or cancelling tugs, pilot or mooring boat are to be for Owners' account.

**52. Blacklisting:**
Owners warrant that at the commencement of this Charter Party, the vessel is not blacklisted by the United States of America and/or Canadian authorities and/or longshoremen associations nor by Scandinavian, Australian, South African and/or Arab countries.

**53. Bills of Lading:**
1.     If required by Charterers and/or their Agents, Master is to authorise them, in Owners' P and I Club recommended wording, to sign Bills of Lading or Seaway Bills for Japan discharging (Charterers or sub/head Charterers' form) on his behalf in accordance with Mate's and/or Tally Clerk's receipts without prejudice to this Charter Party.
2.     Discharging port(s) shown on Bills of Lading or Seaway Bills for Japan discharging do not constitute a declaration of discharging port(s) and Charterers have the right to order the vessel to any safe port(s) within the terms of this Charter Party In this case Charterers are to give prior notice thereof in advance to Owners.
3.     Charterers to ensure Bills of Lading arrive at discharging ports in good time for vessel's arrival.
4.     In the event that Charterers request Owners to discharge cargo either:

A) without Bills of Lading and/or

B) at a discharging port other than that named in the Bill of Lading and/or

C) that is different from the Bill of Lading quantity,

then Owners shall discharge such cargo in accordance with Charterers' instructions in consideration of receiving a Letter of Indemnity on Charterers' head office headed paper signed by Charterers only with wording as per Owners' P and I Club without bank counter-signature. Signatory to be an authorized officer of the Charterers with indemnity showing his position in the company and his signature to be duly witnessed. Original hard copy of Letter of Indemnity should be mailed / sent by courier to Owners as soon as possible when issued. Owner to accept Charterers' fax or emailed /scanned Letter of Indemnity.

**54. Certificates:**

The Owners warrant that throughout the currency of this Charter Party, the vessel shall be in possession of any necessary valid certificates enabling the vessel to perform the Charter Party and to comply with all applicable requirements, regulations and recommendations, including but not limited to:

- Tonnage and Measurement Certificates
- Classification and Trading Certificates
- Certificates issued pursuant to Section 311(P) of the U.S Federal Water Pollution Control Act, as amended (Title 33 U.S. Code. Section 1321(P)
- Certificates of Financial Responsibility to trade to U.S. waters or to the waters of any other country relevant under this Charter Party
- ISM Certificates
- Certificates pertaining to the crew

Any time lost or other consequence of any failure to comply with this warranty shall be for Owners' account.

**55. Suez Certificates:**

Throughout the period of the Charter, vessel will have on board current valid Suez Canal Certificates and will so comply with all applicable requirements, regulations and recommendations as to avoid any delay in transit of canal, failing which time and expenses to be for Owners' account including but not limited to any tug assistance to the vessel.

**56. Vaccination Certificates:**

Owners shall be responsible for and arrange at their own expense that the Master, Officers and crew of the vessel to be vaccinated and to be in possession of valid vaccination certificates on delivery of the vessel and throughout the period of this Charter Party. Any time lost and/or additional expenses incurred due to failure to provide such certificates shall be for Owners' account.

**57. Quarantine:**

Normal quarantine time and expenses to enter port are to be for Charterers' account. Any extra time or detention and expenses for quarantine due to pestilence and illness of the vessel's Master, Officers and crew are to be for Owners' account, but if quarantine detention is on account of the vessel having been sent by Charterers to any infected port, such detention time and expenses are to be for Charterers' account.

**58. Fumigation:**

Owners are to supply valid deratisation or equivalent certificate on vessel's delivery and if same does not cover whole period of this Charter Party, cost of fumigation (in case fumigation needed) shall be for Owners' account and time so required is not to count unless fumigation is required on account of cargo carried or ports visited while vessel is employed under this Charter Party in which case, cost, risk and time are to be for Charterers' account

**59. Compliance with U.S. Safety and Health Regulations:**

If the vessel calls at any U.S. port for the purpose of loading or discharging cargo, the vessel's equipment shall comply with regulations established under U.S. Public Law 85-742 Part 9 (Safety and Health Regulations for Longshoring) or any subsequent amendments. If longshoremen are not permitted to work due to the failure of Master and/or Owners to comply with the aforementioned regulations, any delays to the vessel resulting shall be for Owners' account.

**60. Compliance with International Conventions:**

1. In the event of the vessel being prevented from performing, or being unable to perform the service immediately required hereunder, by reason of:
a) Action on the part of relevant authorities resulting from non-compliance with any compulsory applicable enactment enforcing all or part of any of the following international conventions:
- International Convention for the Safety of Life at Sea, either SOLAS *1* 960, or SOLAS 1974, or SOLAS I 974 in conjunction with its 1978 protocol.
- International Convention Load Lines 1988 Protocol with amendments in 1995 and 2003
- International Convention for the Prevention of Pollution from Ships I 973, in conjunction with its 1978 protocol.
- ILO Merchant Shipping (minimum standards) Convention 1976 (Nr. 147).
- International Convention on Standards of Training, Certification and Watch Keeping for Seafarers 1978 as amended 1995
   b) Labour stoppages or shortage, boycott, secondary boycott, manifestation of any kind in services essential to the operation of the vessel owing to its flag or registry or ownership or management or to the conditions of employment on board.

   Provided always that the event described in (a) and/or (b) is not directed against the Charterers or brought about by any act, instruction or omission on the part of the Charterers, then any loss of time shall result in the vessel being off-hire and shall be dealt with in accordance with the off-hire clause.

2. It is understood that, if necessary, vessel will comply with safety regulations and/or requirements in effect at ports of loading and/or discharging. A particular reference is the United States Department of Labour Safety and Health Regulations set forth in part III of the Federal Register.

   Although other provisions of this charter make it the responsibility of the Owners, it is agreed that should the vessel not meet safety rules and regulations, Owners will make immediate corrective measures and any stevedore standby time and other expenses involved including off hire, will be for Owners' account.

## 61. Smuggling:
Any delay, expenses and/or time incurred on account of smuggling are to be for Charterers' account. If caused by Charterers and/or persons appointed by Charterers and are to be for Owners' account, if caused by Owners, Officers and/or crew and/or persons appointed by Owners.

## 62. Pratique
Vessel shall prepare radio pratique, when instructed by Charterers and be in possession of necessary certificates including Japanese Sanitary Certificates. Charterers' agent(s) will assist, as trading pattern allows and properly direct Master regarding the Port Authority's requirements well in advance, prior to vessel's arrival at subject port, however, should any time and/or expenses be incurred, same to be for Owners' account

## 63. Plan/Draft Survey:
1. Prior to delivery, Owners are to supply General Arrangement Plans, Deadweight Scale and Capacity Plan to Charterers.
2. Owners warrant that the vessel will throughout the duration of the Charter Party have on board capacity plan, hydrostatic curves and tables of displacement, tank calibration and trimming correction tables. All sounding tubes to be in good maintenance condition and free from impediments and vessel to have ballast tanks either empty or pressed full and trim to be to minimum and not exceed trim table corrections. If vessel does not comply with above requirements, she will be put off hire until able to perform such survey. Master to keep written record of drainage moisture pumped out/in. If required, Master to forward to Charterers upon arrival at unloading port and before start of discharging, a certificate indicating all ballast remains.

## 64. Suspension in Case of War:
In the event of war or war-like operations involving two or more of the following nations directly: The United States of America, EU countries, South Korea, Japan, Australia, C.I.S. and People's Republic of China and/or the nation under the flag which vessel is performing under this Charter is registered, which seriously affects Charterers' or Owners' ability to perform their obligations under this

Charter Party, both Charterers and Owners shall have the right to suspend this Charter Party with three (3) weeks' written notice without liability to the other party. If the Charter Party is suspended, such suspension shall take place at port of destination after discharge of any cargo on board, subject to the provisions of attached Conwartime 2004 Clause.

**65. Vessel's Inspection:**
Charterers have the benefit of holding vessel's inspection at any time at their expense on giving reasonable notice to Owners. Owners or Master is to give facility and assistance to carry out this inspection.

**66. Off-Hire Bunker Consumption:**
Bunkers consumed during any period during which the vessel is off hire for whatever cause, shall be calculated at the latest bunkering price actually paid by the Charterers.

**67. Vessel's Gear:**
Vessel to work day and night, if required by Charterers. Any overtime charges for Officers and crew are to be for Owners' account. If the vessel's gear for opening and closing hatches becomes inoperative, the vessel is to be off-hire. Such off-hire is to be calculated pro rata to the number of inoperative hatches and is only to count if ship's loading or discharging is actually delayed.

**68. Hatches:**
Crew are to open and close hatches before, during and after stevedore work when and where required and when permitted by shore regulations.

**69. Fresh Water:**
Fresh water consumed under this Charter for the purpose of drinking, washing of Master, Officers and crew on board is to be for Owners' account. Fresh water consumed for the purpose of hold cleaning as Chartere's request to be for Chartere's's account.

**70. Sub-Let:**
Charterers may sub-let vessel but shall always remain responsible to Owners for due fulfillment of this Charter Party.

**71. Watchmen**
Watchmen are to be for Owners' account if so ordered/requested by Owners and/or Master.

**72. Owners' Agents:**
Owners may appoint Charterers' Agents to deal with Owners' matters. Charterers agree to have their Agents attend to such matters of Owners without Agents charging extra agency fee.

All expenses pertaining to Owners to be settled directly between Owners and Agents at cost

**73. Additional Expense:**
Charterers are to pay a lumpsum of US$1,800 per month or pro rata to cover cabling/entertainment/victualling for Charterers' account disbursed by Owners.

**74. Excessive Days in Port:**
Prolonged Port Stays:
If the vessel's performance is adversely affected as a result of bottom fouling by reason of the vessel being at anchorage(s) and/or port(s) for prolonged periods in excess of consecutive Thirty Five (25) days then Owners shall not be responsible for any under-performance of the vessel and Charterer shall not claim against Owners in this respect.

If required, the vessel's underwater hull area to be inspected and cleaned if necessary at first available opportunity with such work carried out in Charterers' time and at their risk and expense.
After cleaning operation, the speed/consumption warranties are reinstated.

**75. Double-Banking Clause:**
a)       The Charterers shall have the right, where and when it is customary and safe for vessels of similar size and type to do so, to order the vessel to go, lie or remain alongside another vessel

or vessels of any size or description whatsoever or to order such vessels to come and remain alongside at such safe dock, wharf, anchorage or other place for transhipment, loading or discharging of cargo and/ or bunkering.

b)   The Charterers shall pay for and provide Yokohama fenders and such assistance and equipment as may be required to enable any of the operations mentioned in this clause to be safely completed and shall give the Owners such advance notice as they reasonably can of the details of any such operation.

c)   Without prejudice to the generality of the Charterers' rights under a) and b) it is expressly agreed that the Master shall have the right to refuse to allow the vessel to perform as provided in a) and b) if, in his reasonable opinion, it is not safe to do so.

d)   The Owners shall be entitled to insure any deductibles under the vessel's hull policy and the Charterers shall reimburse the Owners any additional premium (premia) required by the vessel's Underwriters and/or the cost of insuring any deductible under the vessel's hull policy against facsimile or email/scanned copy of Underwriters' invoice.

e)   Notwithstanding any other provision of this Charter, the Charterers shall indemnify the Owners for all losses, damages and expenses of whatsoever nature (whether caused in whole or in part by the negligence of the Master of the Vessel and/or the other officers and crew on board the Vessel) arising from or in connection with any double banking operation performed under this Charter against Underwriters' original invoice.

**76. G.M.T.**
For delivery, redelivery, E.T.A., E.T.S., etc., time to be advised in local time. For calculation purposes, hire to be computed in GMT.

**77.  Change of Flag/Ownership:**
Owners shall have the right to change the vessel's flag and/or crew and/or ownership or sell the vessel, subject to Charterers' prior approval which is not to be unreasonably withheld based on Owners' full disclosure of the identity of the Buyer. Such change(s) are not, in any way, to hinder, prevent or detract from Charterers' rights and ability to use the vessel according to present Charter Party terms.

**78. Deviation/Put Back:**
In the event of loss of time either in port or at sea, deviation from the course of the voyage or putting back whilst on voyage, caused by sickness of or an accident to or misconduct by Master/Officers/crew, stowaway, refugee or any person on board vessel other than persons travelling by request of Charterers or by reason of the refusal of Master or Officer(s) or crew to perform their duties or an accident or breakdown to vessel or drydocking or periodical survey, the hire shall be suspended from the time of inefficiency in port or at sea, deviation or putting back until vessel is again efficient in the same or equivalent position and Owners shall be entitled for distance made good, and all expenses incurred including bunkers consumed during such period of suspension shall be for Owners' account  It is understood that any deviation for the purpose of saving life and/or properly not to be considered a deviation.

**79. Cargo Claims:**
Cargo claims as between the Owners and the Charterers shall be settled in accordance with the Inter-club New York Produce Exchange Agreement of February 1970 as amended September 1996 as attached or any subsequent amendments.

**80.  English Law:**
This Charter Party shall be governed by and construed in accordance with English Law.

**81.  U.S. Anti-Drug Abuse Act 1986 Clause:**

This Clause is not confin ed to USA trading.

(a)  In pursuance of the provisions of the U.S. Anti Drug Abuse Act 1986, or any re-enactment thereof, the Charterers warrant to exercise the highest degree of care and diligence in preventing unmanifested narcotic drugs and marijuana to be loaded or concealed on board the Vessel.

Non-compliance with the provisions of this Clause shall amount to breach of warranty for the consequences of which the Charterers shall be liable and shall hold the Owners, the Master and the

crew of the Vessel harmless and shall keep them indemnified against all claims whatsoever which may arise and be made against them individually or jointly.

Furthermore, all time lost and all expenses incurred, including fines, as a result of the Charterers' breach of the provisions of this Clause shall be for the Charterers' account and the Vessel shall remain on hire.

Should the Vessel be arrested as a result of the Charterers' non-compliance with the provisions of this Clause, the Charterers shall at their expense take all reasonable steps to secure that within a reasonable time the Vessel is released and at their expense put up bail to secure release of the Vessel.

The Owners shall remain responsible for all time lost and all expenses incurred, including fines, in the event that unmanifested narcotic drugs and marijuana are found in the possession or effects of the Vessel's personnel.

(b) The Owners shall arrange for a precautionary survey to be undertaken in order to search for illegal substances on or about the vessel and the costs and any time lost shall be apportioned equally between the Owners and the Charterers.

Notwithstanding the content of paragraph (c) compulsory surveys are always to be for Charterers' time/expense.

## 82. BIMCO Standard ISM Clause:
From the date of coming into force of the International Safety Management (ISM) Code in relation to the vessel and thereafter during the currency of this Charter Party, the Owners shall procure that both the vessel and the Company (as defined by the ISM Code) shall comply with the requirement of the ISM Code.

Upon request the Owners shall provide a copy of the relevant Document of Compliance (DOC) and Safety Management Certificate (SMC) to the Charterers.

Except as otherwise provided in this Charter Party, loss, damage, expense or delay caused by the failure on the part of the Owners or the Company' to comply with the ISM Code shall be for Owners' account.

## 83.
Charterers have the option to add off-hires including Drydock time to the period of this Charter, if any. Such option to be declared minimum 40 days before scheduled redelivery.

## 84.
Any time if actually lost or cost involved in vessel's inspection due to suspected drug smuggling, including underwater inspection or cost of security guards to be shared equally between Owners and Charterers, provided Owners employees/personnel proven not to be involved.

## 85. West Coast of South America Trading:
If, during the course of this Charter, Charterers consider trading the vessel to West Coast of South America, then Owners to be advised at earliest possible time of such intention. Mooring ropes/wires as on board but any additional mooring ropes/wires or other fittings required for trading to such areas / ports to be supplied and paid for by Charterers.

## 86.
All negotiations to be strictly private and confidential.

## 87. Owners' Banking details:
To be advised.

## 88. Protection Clauses:
New Jason Clause, Arbitration Clause, New Both-to-Blame Collision Clause, Conwartime 2004 War

Risk Clause and Bunker Deviation Clause are hereby agreed to be incorporated into all Bills of Lading issued under this Charter Party.

**89. Hamburg Rules Charter Party Clause:**
Neither the Charterers nor their Agents shall permit the issue of any Bill of Lading, Waybill or other document evidencing a contract of carriage (whether or not signed on behalf of the Owner or on the Charterers' behalf or on behalf of any sub-Charterers) incorporating, where not compulsorily applicable, the Hamburg Rules or any legislation giving effect to the Hamburg Rules or any other legislation imposing liabilities in excess of Hague or Hague-Visby Rules.

Charterers shall indemnify the Owners against any liability, loss or damage which may result from any breach of the foregoing provisions of this Clause.

**90. Bunker Deviation Clause**
Under Charterers' direction and control the vessel shall have the liberty as part of the contract voyage to proceed to any port or ports at which bunker oil is available for the purpose of bunkering at any stage of the voyage whatsoever and whether such ports are on or off the direct and/or customary route or routes between any of the ports of loading or discharge named in this Charter Party and may there take oil bunkers in any quantity in the discretion of Charterers even to the full capacity of fuel tanks and deep tanks and any other compartment in which oil can be carried, whether such amount is or is not required for the chartered voyage.

**91. Deviation Clause:**
The vessel has liberty to call at any port or ports in any order, for any purpose, to sail without pilots, to tow and/or assist vessels in all situations, and also to deviate for the purpose of saving life and/or property.

Eventual costs and benefits to be equally shared by Charterers and Owners.

**92. CLAUSE PARAMOUNT:**
All Bills of Lading issued under this Charter shall include the following Clause:
(1)      This Bill of Lading shall have the effect subject to any national law making the international Convention for the unification of certain rules of law relating to Bills of Lading signed at Brussels on 25th August 1924 (The Hague Rules) or the Hague Rules as amended by the Protocol signed at Brussels on 23rd February 1968 (The Hague-Visby Rules) compulsorily applicable to this Bill of Lading. If any terms of this Bill of Lading be repugnant to that legislation to any extent, such terms shall be void to that extent but no further.
Neither the Hague Rules nor the Hague-Visby Rules shall apply to this contract where the goods carried hereunder consist of live animals or cargo which by this contract is stated as being carried on deck and is so carried.

(2) Save where the Hague or Hague-Visby Rules apply by reason of (1) above, this Bill of Lading shall take effect subject to any national law in force at the port of shipment or place of issue of the Bill of Lading making the United Nations Convention on the Carriage of Goods by Sea *1978* (The Hamburg Rules) compulsorily applicable to this Bill of Lading in which case this Bill of Lading shall have the effect subject to the Hamburg Rules which shall nullify any stipulation derogating therefrom the detriment of the Shipper or Consignee.

(3) Where the Hague, Hague-Visby or Hamburg Rules are not compulsorily applicable to this Bill of Lading, the Carrier shall be entitled to the benefits of all privileges, rights and immunities contained in Article I to VIII of the Hague Rules, safe that the limitation sum for the purpose of Article IV Rule 5 of the Hague Rules shall be £100 sterling.

**93. NEW JASON CLAUSE:**
In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible by statute, contract or otherwise, the goods, shippers, consignees or Owners of the goods shall contribute with the carrier in general average to the

payment of any sacrifices, losses or expenses of a general average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the goods.

If a salving ship is owned or operated by the carrier, salvage shall be paid for a fully as if the said salving ship or ships belonged to strangers. Such deposit as the carrier or his agents may deem sufficient to cover the estimated contribution of the goods and any salvage and special charges thereon shall, if required, be made by the goods, shippers, consignees or Owners of the goods to the carrier before delivery.

**94. NEW BOTH-TO-BLAME COLLISION CLAUSE:**
If the liability for any collision in which the vessel is involved while performing this Charter Party fails to be determined in accordance with the laws of the United States of America, the following clause shall apply:

If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the Master, mariner, pilot or the servants of the carrier in the navigation or in the management of the ship, the Owners of the goods carried hereunder will indemnify the carrier against all loss or liability to the other or non-carrying ship or her Owners in so far as such loss or liability represents loss of or damage to or any claim whatsoever of the Owners of the said goods, paid or payable by the other or non- carrying ship or her Owners to the Owners of the said goods and set off, recouped or recovered by the other or non-carrying ship or her Owners as part of their claim against the carrying ship or carrier.

The foregoing provisions shall also apply where the Owners, operators or those in charge of any ship or ships or objects other than, or in addition to, the colliding ships or objects are at fault in respect to a collision or contact.

**95. WAR RISKS CLAUSE FOR TIME CHARTER – CODE NAME: "CONWARTIME 2004"**

(a)     For the purpose of this Clause, the words :

   (i)     "Owners" shall include the shipowners, bareboat charterers, disponent owners, managers or other operators who are charged with the management of the Vessel, and the Master; and

   (ii)     "War Risks" shall include any actual, threatened or reported :
war; act of war; civil war; hostilities; revolution; rebellion; civil commotion; warlike operations; laying of mines; acts of piracy; acts of terrorists; acts of hostility or malicious damage; blockades (whether imposed against all vessels or imposed selectively against vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever); by any person, body, terrorist or political group, or the Government of any state whatsoever, which, in the reasonable judgement of the Master and/or the Owners, may be dangerous or are likely to be or to become dangerous to the Vessel, her cargo, crew or other persons on board the Vessel.

(b)     The Vessel, unless the written consent of the Owners be first obtained, shall not be ordered to or required to continue to or through, any port, place, area or zone (whether of land or sea), or any waterway or canal, where it appears that the Vessel, her cargo, crew or other persons on board the Vessel, in the reasonable judgement of the Master and/or the Owners, may be, or are likely to be, exposed to War Risks. Should the Vessel be within any such place as aforesaid, which only becomes dangerous, or is likely to be or to become dangerous, after her entry into it, she shall be at liberty to leave it.

(c)     The Vessel shall not be required to load contraband cargo, or to pass through any blockade, whether such blockade be imposed on all vessels, or is imposed selectively in any way whatsoever against vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever, or to proceed to an area where she shall be subject, or is likely to be subject to a belligerents right of search and/or confiscation.

(d)    (i)    The Owners may effect war risks insurance in respect of the Hull and Machinery of the Vessel and their other interests (including, but not limited to, loss of earnings and detention, the crew and their protection and Indemnity Risks), and the premiums and/or calls therefor shall be for their account.

     (ii)    If the Underwriters of such insurance should require payment of premiums and/or calls because, pursuant to the Charterers' orders, the Vessel is within, or is due to enter and remain within, or pass through any area or areas which are specified by such Underwriters as being subject to additional premiums because of War Risks, then the actual premiums and/or calls paid shall be reimbursed by the Charterers to the Owners at the same time as the next payment of hire is due, or upon redelivery, whichever occurs first.

(e)    If the Owners become liable under the terms of employment to pay to the crew any bonus or additional wages in respect of sailing into an area which is dangerous in the manner defined by the said terms, then the actual bonus or additional wages paid shall be reimbursed to the Owners by the Charterers at the same time as the next payment of hire is due, or upon redelivery, whichever occurs first.

(f)    The Vessel shall have liberty:

     (i)    to comply with all orders, directions, recommendations or advice as to departure, arrival, routes, sailing in convoy, ports of call, stoppages, destinations, discharge of cargo, delivery, or in any other way whatsoever, which are given by the Government of the Nation under whose flag the Vessel sails, or other Government to whose laws the Owners are subject, or any other Government, body or group whatsoever acting with the power to compel compliance with their orders or directions;

     (ii)    to comply with the order, directions or recommendations of any war risks underwriters who have the authority to give the same under the terms of the war risks insurance;

     (iii)    to comply with the terms of any resolution of the Security Council of the United Nations, the effective orders of any other Supranational body which has the right to issue and give the same, and with national laws aimed at enforcing the same to which the Owners are subject, and to obey the orders and directions of those who are charged with their enforcement;

     (iv)    to discharge at any other port any cargo or part thereof which may render the Vessel liable to confiscation as a contraband carrier;

     (v)    to call at any other port to change the crew or any part thereof or other persons on board the Vessel when there is reason to believe that they may be subject to internment, imprisonment or other sanctions.

(g)    If in accordance with their rights under the foregoing provisions of this Clause, the Owners shall refuse to proceed to the loading or discharging ports, or any one or more of them, they shall immediately inform the Charterers. No cargo shall be discharged at any alternative port without first giving the Charterers notice of the Owners' intention to do so and requesting them to nominate a safe port for such discharge. Failing such nomination by the Charterers within 48 hours of the receipt of such notice and request, the Owners may discharge the cargo at any safe port of their own choice.

(h)    If in compliance with any of the provisions of sub-clauses (b) to (g) of this Clause anything is done or not done, such shall not be deemed a deviation, but shall be considered as due fulfilment of this Charter Party.

## 96. DRUG AND ALCOHOL POLICY CLAUSE

Owners warrant that they have a policy on Drug and Alcohol Abuse (Policy) applicable to the vessel which meets or exceeds the standards in the Oil Companies International Marine Forum Guidelines for the Control of Drugs and Alcohol Onboard Ship.

Owners further warrant that the Policy will remain in effect during the term of this Charter and that Owners shall exercise due diligence to ensure that the Policy is complied with. It is understood that an actual impairment or a test finding of impairment shall not in and of itself mean the Owner has failed to exercise due diligence.

Owners undertake, unless they have already done it, to sign the U.S. Customs 'Sea Carrier Initiative Agreement' in consideration with the U.S. Anti Drug Abuse Act 1986.

## 97. ASSIGNMENT CLAUSE

1. This Charter Party shall inure solely to the benefit of, and be enforceable solely by, the parties hereto and their respective successors and permitted assigns.
2. Neither party may transfer or assign any of its rights hereunder or any interest herein without the prior written consent of the other party hereto. Provided always that the Owners shall have the right, without the consent of the Charterers, to assign all of their rights, title and interest in and to this Charter Party to any bank(s) or other financial institution(s) for the purpose of securing any and all financial obligations of any nature whatsoever of the Owners and/or the vessel.
3. Notwithstanding anything herein contained to the contrary, the Owners shall remain liable under this Charter Party to perform all the obligations assumed by them hereunder.

Remark:
In case of discrepancies between Printed Form and Rider Clause, Rider Clauses will prevail.

## 98. INTER-CLUB NEW YORK PRODUCE EXCHANGE AGREEMENT 1996

This Agreement is made on the 1st of September 1996 between the P & I Clubs being members of the International Group of P & I Associations listed below (hereafter referred to as 'the Clubs').

This Agreement replaces the Inter Club Agreement 1984 in respect of all charter parties specified in Clause(1) hereof and shall continue in force until varied or terminated. Any variation to be effective must be approved in writing by all the Clubs but it is open to any Club to withdraw from the Agreement on giving to all the other Clubs not less than three months' written notice thereof, such withdrawal to take effect at the expiration of that period. After the expiry of such notice the Agreement shall nevertheless continue as between all the Clubs, other than the Club giving such notice who shall remain bound by and be entitled to the benefit of this Agreement in respect of all Cargo Claims arising out of charter parties commenced prior to the expiration of such notice.

The Clubs will recommend to their Members without qualification that their Members adopt this Agreement for the purpose of apportioning liability for claims in respect of cargo which arise under, out of or in connection with all charter parties on the New York Produce Exchange Form 1946 or 1993 or Asbatime Form 1981 (or any subsequent amendment of such Forms), whether or not this Agreement has been incorporated into such charter parties.

Scope of Application
(1) This Agreement applies to any charter party which is entered into after the date hereof on the New York Produce Exchange Form 1946 or 1993 or Asbatime Form 1981 (or any subsequent amendment of such Forms).

(2) The terms of this Agreement shall apply notwithstanding anything to the contrary in any other provision of the charter party; in particular the provisions of clause (6) (time bar) shall apply notwithstanding any provision of the charter party or rule of law to the contrary.

(3) For the purposes of this Agreement, Cargo Claim(s) mean claims for loss, damage, shortage (including slackage, ullage or pilferage), overcarriage of or delay to cargo including customs dues or fines in respect of such loss, damage, shortage, overcarriage or delay and include
(a) any legal costs claimed by the original person making any such claim;
(b) any interest claimed by the original person making any such claim;

(c) all legal, Club correspondents' and experts' costs reasonably incurred in the defence of or in the settlement of the claim made by the original person, but shall not include any costs of whatsoever nature incurred in making a claim under this Agreement or in seeking an indemnity under the charter party.

(4) Apportionment under this Agreement shall only be applied to Cargo Claims where:
(a) the claim was made under a contract of carriage, whatever its form,
(i) which was authorised under the charter party;
or
(ii) which would have been authorised under the charter party but for the inclusion in that contract of carriage of Through Transport or Combined Transport provisions, provided that (iii) in the case of contracts of carriage containing Through Transport or Combined Transport provisions (whether falling within (i) or (ii) above,) the loss, damage, shortage, overcarriage or delay occurred after commencement of the loading of the cargo onto the chartered vessel and prior to completion of its discharge from that vessel (the burden of proof being on the Charterer to establish that the loss, damage, shortage, overcarriage or delay did or did not so occur); and
(iv) the contract of carriage (or that part of the transit that comprised carriage on the chartered vessel) incorporated terms no less favourable to the carrier than the Hague or Hague-Visby Rules, or when compulsorily applicable by operation of law to the contract of carriage, the Hamburg Rules or any national law giving effect thereto.
and
(b) the cargo responsibility clauses in the charter party have not been materially amended. A material amendment is one which makes the liability, as between Owners and Charterers, for Cargo Claims clear. In particular, it is agreed solely for the purposes of this Agreement;
(i) that the addition of the words 'and responsibility' in clause 8 of the New York Produce Exchange Form 1946 or 1993 or clause 8 of the Asbatime Form 1981 , or any similar amendment of the charter party making the Master responsible for cargo handling, is not a material amendment; and
(ii) that if the words 'cargo claims' are added to the second sentence of clause 26 of the New York Produce Exchange Form 1946 or 1993 or clause 25 of the Asbatime Form 1981, apportionment under this Agreement shall not be applied under any circumstances even if the charter party is made subject to the terms of this Agreement.
and
(d) the claim has been properly settled or compromised and paid.
(5) This Agreement applies regardless of legal forum or place of arbitration specified in the charter party and regardless of any incorporation of the Hague, Hague-Visby Rules or Hamburg Rules therein.

Time Bar
(6) Recovery under this Agreement by an Owner or Charterer shall be deemed to be waived and absolutely barred unless written notification of the Cargo Claim has been given to the other party to the charter party within 24 months of the date of delivery of the cargo or the date the cargo should have been delivered, save that, where the Hamburg Rules or any national legislation giving effect thereto are compulsorily applicable by operation of law to the contract of carriage or to that part of the transit that comprised carriage on the chartered vessel, the period shall be 36 months. Such notification shall if possible include details of the contract of carriage, the nature of the claim and the amount claimed.

The Apportionment
(7) The amount of any Cargo Claim to be apportioned under this Agreement shall be the amount in fact borne by the party to the charter party seeking apportionment, regardless of whether that claim may be or has been apportioned by application of this Agreement to another charter party.

(8) Cargo Claims shall be apportioned as follows:

(a) Claims in fact arising out of unseaworthiness and/or error or fault in navigation or management of the vessel

   100%   Owners

save where the Owner proves that the unseaworthiness was caused by the loading, stowage, lashing, discharge or other handling of the cargo, in which case the claim shall be apportioned under sub-clause (b).

(b) Claims in fact arising out of the loading, stowage, lashing, discharge, storage or other handling of cargo:

      100%            Charterers

unless the words 'and responsibility' are added in Clause 8 or there is a similar amendment making the Master responsible for cargo handling in which case:

      50% Charterers
      50% Owners

save where the Charterer proves that the failure properly to load, stow, lash, discharge or handle the cargo was caused by the unseaworthiness of the vessel in which case:

      100%            Owners

(c) Subject to (a) and (b) above, claims for shortage or overcarriage:

      50% Charterers
      50% Owners

unless there is clear and irrefutable evidence that the claim arose out of pilferage or act or neglect by one or the other (including their servants or sub-contractors) in which case that party shall then bear 100% of the claim.

(d) All other cargo claims whatsoever (including claims for delay to cargo):

      50%Charterers
      50% Owners

unless there is clear and irrefutable evidence that the claim arose out of the act or neglect of the one or the other (including their servants or sub-contractors) in which case that party shall then bear 100% of the claim.

Governing Law

(9) This Agreement shall be subject to English Law and Jurisdiction, unless it is incorporated into the charter party (or the settlement of claims in respect of cargo under the charter party is made subject to this Agreement), in which case it shall be subject to the law and jurisdiction provisions governing the charter party.

## 99. Arbitration Clause

Arbitration in London and English Law to apply.

"If either of the arbitrators appointed refuses to continue to act, or is incapable of acting or dies, the party which appointed that Arbitrator shall appoint a new arbitrator. If, within fourteen (14) days of receipt of a written request to do so from one party, the other Party has failed to appoint their own arbitrator (either originally or by way of substitution (the "party in default"), the party which is not the party in default shall be entitled to appoint its own Arbitrator as sole arbitrator in the reference and his award shall be binding on both parties as if he had been appointed by consent"

## 100. Ballast Disinfection Clause

Any detergent/disinfectant required by authorities to be added to ballast water prior to ballasting/deballasting tanks or hold spaces within National Territorial Waters of respective countries to be supplied by Charterers at their risk, time and expense.

### 101. BIMCO BUNKER QUALITY CLAUSE

1) The Charterers shall supply bunkers of a quality suitable for burning in the vessel's engines and auxiliaries and which conform to the specification(s) mutually agreed under this Charter.

2) At the time of delivery of the vessel the Owners shall place at the disposal of the Charterers, the bunker delivery note(s) and any samples relating to the fuels existing on board.

3) During the currency of the Charter the Charterers shall ensure that bunker delivery notes are presented to the vessel on the delivery of fuel(s) and that during bunkering representative samples of the fuel(s) supplied shall be taken at the vessel's bunkering manifold and sealed in the presence of competent representatives of the Charterers and the vessel.

4) The fuel samples shall be retained by the vessel for 90 (ninety) days after the date of delivery or for whatever period necessary.

### 102.    ICE CLAUSE

The vessel not to be ordered to, nor bound to enter any ice-bound place or any whose lights, lightships, marks and buoys are or likely to be withdrawn by reason of ice on the vessel's arrival or where there is risk that ordinarily the vessel will not be able on account of ice to reach the place or to get out after having completed loading or discharging. The vessel not to be obliged to force ice, to follow ice-breakers when inwards bound. If on account of ice the Master considers it dangerous to remain at the loading or discharging place for fear of the vessel being frozen in and be damaged, he has the liberty to sail to a convenient open place and await the Charterers' fresh instructions. Detention through any above causes to be for the Charterers' account.

### 103.    OIL POLLUTION CLAUSE

1. Owners warrant that throughout the currency of this Charter they will provide the vessel with the following certificates:

A) Certificates issued pursuant to Section 311(P) of the U.S. Federal Water Pollution Control Act, as amended (Title 33 U.S. Code Section 1 321(P)) up to (insert the date upon which such certificate(s) is/are due to expire).

B) Certificates issued pursuant to Section 1016(A) of the Oil Pollution Act 1990, and Section 108(A) of the Comprehensive Environmental Response, Compensation and Liability Act 1980, as amended in accordance with Part 138 of Coast Guard Regulations 33 CFR, from (indicate the earliest date upon which the Owners may be required to deliver the vessel into the Charter or, if later, the date inserted in sub paragraph (A) above), so long as these can be obtained by the Owners from or by (identify the applicable scheme or schemes, for example SIGCO).

2. Notwithstanding anything whether printed or typed herein to the contrary,

A) Save as required for compliance with paragraph (1) hereof, Owners shall not he required to establish or maintain financial security or responsibility in respect of oil or other pollution damage to enable the vessel lawfully to enter, remain in or leave any port, place, territorial or contiguous waters of any country, state or territory in performance of this Charter.

B) Charterers shall indemnify Owners and hold them harmless in respect of any loss, damage, liability or expense (including but not limited to the costs of any delay incurred by the vessel as a result of any failure by the Charterers promptly to give alternative voyage orders) whatsoever and howsoever arising which Owners may sustain by reason of any requirement to establish or maintain financial security or responsibility in order to enter, remain in or leave any port, place or waters, other than to the extent provided in paragraph (1) hereof.

C) Owners shall not be liable for any loss, damage, liability or expense whatsoever and howsoever arising which Charterers and/or the holders of any Bill of Lading issued pursuant to establish or maintain financial security or responsibility in order to enter, remain in or leave any port, place or waters, other than to the extent provided in paragraph (1) hereof.

3. Charterers warrant that the terms of this Clause will be incorporated effectively into all Bills of Lading issued under this charter Party.

## 104.  SEA WAYBILLS CLAUSE
Discharge of cargo against Seaway Bill is allowed.
The Master shall sign Bills of Lading and/or Sea Waybills for cargo as presented in strict accordance with Mate's/Tally Clerk's receipts. However, the Charterers may sign Bills of Lading and/or Sea Waybills on the Master's behalf with Owners' prior written authority, always in accordance with Mate's/Tally Clerks receipts.

Charterers are permitted to use non-negotiable general Sea Waybills for the purposes of this Charter, always provided the Consignee's name and address is entered on the Sea Waybill on issue and the Charterers' instruction is that the cargo is to be delivered to that named Consignee. The Sea Waybill to be BIMCO Genwaybill form incorporating the Hague-Visby Rules and all clauses of the Charter Party, including the Arbitration London/English Law Clause.

Charterers to use BIMCO 'Genway' bills issued by BIMCO subject to The CMI Uniform Rules for Sea Waybills with the following Transfer of Control Clause' incorporated.

It is hereby noted that the Shipper has irrevocably transferred the right of control (of disposal) of the goods to the Consignee under Rule 6 (II) of the CMI Uniform Rules for Sea Waybills. The carrier will hold the goods to the order of the Consignee subject to any lien in favour of the carrier.

Charterers hereby agree to indemnify Owners/Master against any consequences arising therefrom

## 105.  U.S. SECURITY CLAUSE FOR TIME CHARTERING
If the vessel calls in the United States, including any U.S. territory, the following provisions shall apply with respect to any applicable security regulations or measures:

Notwithstanding anything else contained in the Charter Party, all costs or expenses arising out of or related to security regulations or measures required by any U.S. authority including, but not limited to, security guards, launch services, tug escorts, port security fees or taxes and inspections, shall be for the Charterers' account, unless such costs or expenses result solely from the Owners' negligence.

Additional Clause 1
In the event of new legislation being introduced at any time after entering into this Charter, which may directly and majorly affect its performance, then both Owners and Charterers agree to mutually find a way to accommodate said changes (always in line with usual cape size shipping practice).

Additional Clause 2
Any additional Insurance premium charged by Owners underwriters due to vessel's age/class to be for Charterers' account.

## 106.  BUNKER CLAUSE
Throughout the currency of this charter, Charterers shall supply the vessel with homogeneous blends of fuel which must always be fit for purpose such that the vessel can safely burn same in the main engine and auxiliaries, always within ISO 8217:2005 (E) standards and MARPOL 73/78 Annex VI requirements, and any subsequent amendments thereof in countries where ratified.

Vessel to be supplied with the following grades of bunkers:

IFO: RMG 380 specification. DDO: (Distillate Diesel Oil) to DMB specification.

If specific grades of IFO or DDO are not available, Charterers must give Owners adequate prior notice of any substitute available grade of fuel and advise full specification for approval /acceptance.

Charterers have the option to bunker the vessel at South African ports with RME/RMF 180CST maximum sufficient to reach nearest main bunkering port with Owners' prior consent which not to be unreasonably withheld.

If bunkers supplied by Charterers are not in any respect compliant with above specification and/or are unfit for purpose such that they are not suitable for burning in the main engine or auxiliaries, Owners shall not to be responsible for vessel's performance and shall be released from any performance

warranty under this charter until such time as all non compliant and/or unfit bunkers have been removed from the vessel. Furthermore, Charterers hereby indemnify and hold Owners harmless in respect of all proven engine/purification system and/or mechanical damage, deviation, repair costs, losses, liabilities, expenses, delay or fines of whatsoever nature which Owners may suffer or incur arising from or in connection with the supply to the vessel by the Charterers of non-compliant or unfit bunkers.

Resolution of any dispute between Owners and Charterers as to whether the bunkers supplied are compliant with the above specification to be determined, on a shared cost basis, by a mutually agreed analyst (in the event that the parties fail to agree within seven (7) days of one party's request, upon the identity of such analyst, either party may apply to the current President of the LMAA to make such appointment, whose decision shall be binding on both parties) on the basis of their analysis of sealed bunker samples (from ship's manifold). In the event that such analysis establishes the fuel is unfit for purpose and where engine/purification system and/or mechanical damage is involved or performance seriously affected, further testing of parameters beyond the scope of normal fuel analysis shall be performed by the mutually agreed analyst whose findings as to whether the bunkers are compliant with the above specification shall be conclusive evidence of compliance or otherwise (with the requisite specification) of the bunkers supplied and such findings shall be binding on both parties, the cost of which to be equally shared between Owners and Charterers.

If Charterers arrange/supply bunkers at a port/country that has not ratified the MARPOL 73/78 convention, or any subsequent amendments thereof, they will ensure the supplier fully complies with sampling procedures and issues all relevant documentation required by MARPOL 73/ 78 Annex VI, failing which, the Charterers shall indemnify, defend and hold harmless the Owners in respect of any loss, liability, delay, fines, costs or expenses arising or resulting from this non-compliance.

Owners have liberty to bunker the vessel for their own account at Charterers' final bunker port or discharge port prior to redelivery providing such bunkering does not interfere with Charterers' operation.

Charterers have a right to deduct the value of estimated bunkers remaining on hoard on redelivery from penultimate and last hire payment(s). The estimated value of bunkers upon redelivery to be deemed an advance against hire and shall not be subject to commission.

## 107. FUEL SULPHUR CONTENT CLAUSE

Notwithstanding anything else contained in this Charter Party, the Charterers shall supply fuels of such specifications and grades to permit the vessel, at all times, to comply with the maximum sulphur content requirements of any emission control zone when the vessel is ordered to trade within that zone. The Charterers shall indemnify, defend and hold harmless the Owners in respect of any loss, liability, delay, fines, costs or expenses arising or resulting from the Charterers' failure to comply with this Clause.

For the purpose of this Clause, emission control zone shall mean zones as stipulated in Marpol Annex VI and/or zones regulated by regional and/or national authorities such as, but not limited to, the E.U. and the U.S. Environmental Protection Agency.

## 108. BIMCO-Stowaways Clause for Time Charter Parties 2009

(a) If stowaways have gained access to the Vessel by means of secreting away in the goods and/or containers or by any other means related to the cargo operation, this shall amount to breach of charter. The Charterers shall be liable for the consequences of such breach and hold the Owners harmless and keep them indemnified against all claims; costs (including but not limited to victualling costs for stowaways whilst on board and repatriation); losses; and fines or penalties, which may arise and be made against them. The Charterers shall, if required, place the Owners in funds to put up bail or other security. The Vessel shall remain on hire for any time lost as a result of such breach.

(b) Save for those stowaways referred to in sub-clause (a), if stowaways have gained access to the Vessel, all expenses, including fines or penalties, shall be for the Owners' account and the Vessel shall be off hire for any time lost.

**109.** BIMCO Piracy clause for Time Charter Parties 2009

(a) The Vessel, unless the written consent of the Owners be first obtained, shall not be ordered to or required to continue to or through, any port, place, area or zone (whether of land or sea), or any waterway or canal, where it appears that the Vessel, her cargo, crew or other persons on board the Vessel, in the reasonable judgement of the Master and/or the Owners, may be, or are likely to be, exposed to any actual, threatened or reported acts of piracy, whether such risk of piracy existed at the time of entering into this charter party or occurred thereafter. Should the Vessel be within any such place as aforesaid, which only becomes dangerous, or is likely to be or to become dangerous, after her entry into it, she shall be at liberty to leave it.

(b) If the Owners do not give their consent they shall immediately inform the Charterers and the Charterers shall be obliged to issue alternative voyage orders and any time lost due to compliance with such orders shall not be considered off-hire. The Charterers shall indemnify the Owners for any claims from holders of Bills of Lading or third parties caused by such orders.

(c) If the Owners consent or if the Vessel proceeds to or through an area exposed to risk of piracy the Owners shall have the liberty:

(i) to take reasonable preventive measures to protect the vessel, her crew and cargo including but not limited to taking a reasonable alternative route, proceeding in convoy, using escorts, avoiding day or night navigation, adjusting speed or course, or engaging security personnel or equipment on or about the vessel,

(ii) to comply with the orders, directions or recommendations of any underwriters who have the authority to give the same under the terms of the insurance;

(iii) to comply with all orders, directions, recommendations or advice given by the Government of the Nation under whose flag the Vessel sails, or other Government to whose laws the Owners are subject, or any other Government, body or group, including military authorities, whatsoever acting with the power to compel compliance with their orders or directions;

(iv) to comply with the terms of any resolution of the Security Council of the United Nations, the effective orders of any other Supranational body which has the right to issue and give the same, and with national laws aimed at enforcing the same to which the Owners are subject, and to obey the orders and directions of those who are charged with their enforcement;
and the Charterers shall indemnify the Owners for any claims from holders of Bills of Lading or third parties caused by such orders.

(d) Costs

(i) If the Vessel proceeds to or through an area where due to risk of piracy additional costs will be incurred including but not limited to additional insurance, additional personnel and preventative measures to avoid piracy attacks, such costs shall be for the Charterers' account. Any time lost waiting for convoys, following recommended routeing, timing, or reducing speed or taking measures to minimise risk, shall be for the Charterers' account and the Vessel shall remain on hire;

(ii) If the Owners become liable under the terms of employment to pay to the crew any bonus or additional wages in respect of sailing into an area which is dangerous in the manner defined by the said terms, then the actual bonus or additional wages paid shall be reimbursed to the Owners by the Charterers at the same time as the next payment of hire is due, or upon redelivery, whichever occurs first;

(iii) If the underwriters of the Owners' insurances should require payment of additional premiums and/or calls because, pursuant to the Charterers' orders, the Vessel is within, or is due to enter and remain within, or pass through any area or areas which are specified by such Underwriters as being subject to additional premiums because of piracy risks, then the actual additional premiums and/or calls paid shall be reimbursed by the Charterers to the Owners at the same time as the next payment of hire is due, or upon redelivery, whichever occurs first.

(e) If the Vessel is attacked or seized by pirates any time lost shall be for the account of the Charterers and the Vessel shall remain on hire. If the Vessel is seized the Owners shall keep the Charterers closely informed of the efforts made to have the Vessel released.

(f) If in compliance with this Clause anything is done or not done, such shall not be deemed a deviation, but shall be considered as due fulfilment of this Charter Party.
*Issued*